[No. 14285.  Department One.  February 8, 1918.]

THOMSON & STACY COMPANY, *Respondent,* v. EVANS,
COLEMAN & EVANS (LIMITED), *Appellant.*[1]

SALES—CONTRACTS—CONSTRUCTION.  A contract for the sale of
Calcutta grain sacks did not imply that the sacks were to be im-
ported into the United States from British Columbia, from the fact
that it was written on a letter head showing the seller's office to
be in Vancouver, B. C.; nor from the fact that it required delivery
"ex steamer Seattle-Tacoma," nor from the fact that the price was
based on the present customs tariff; since the contract was con-
sistent with the purchase and shipment of the sacks from any other
port or in the United States; and a subsequent embargo upon such
importations was therefore no defense to the seller's breach.

EVIDENCE—TO VARY WRITING—AMBIGUITY.  A contract for the
sale of Calcutta grain sacks is not ambiguous or incomplete merely
because it does not stipulate where they were to come from, and ex-
trinsic evidence that they were to be shipped from British Columbia
is inadmissible where the written contract of sale defined with ex-
actness the undertaking in every particular.

Appeal from a judgment of the superior court for
Pierce county, Clifford, J., entered February 19, 1917,
upon findings in favor of the plaintiff, in an action on
contract, tried to the court.  Affirmed.

*Raymond McMillan* and *Ernest K. Murray,* for ap-
pellant.

*Hayden, Langhorne & Metzger,* for respondent.

ELLIS, C. J.—Plaintiff seeks to recover, on three
causes of action, damages for delay in delivery of Cal-
cutta grain sacks purchased by it from defendant under
three separate contracts.  The contract upon which the
first count is predicated reads as follows:

"Vancouver, B. C., December 1st, 1915.
"Evans, Coleman & Evans, Limited.
"Messrs. Thomson Stacy Co.,
"Tacoma, Wash.
"We have entered your order for the following
goods:

[1]Reported in 170 Pac. 578.

"Fifty bales each 1,000 Standard Calcutta grain sacks, 36"x22"—12 oz.

"Price. 8¾c per sack ex. steamer Seattle—Tacoma. X.

"Terms. Cash on delivery.

"Delivery. Second half June, 1916.

"This sale is based on the present Customs Tariff, viz.: 10 per cent ad valorem. Any changes to be for account of purchaser.

"All agreements contained herein are contingent on strikes, accidents and other delays, unavoidable or beyond our control.

                    "Evans, Coleman & Evans, Limited,
                         "W. L. Martin, Sellers.

"Accepted:

"Thomson & Stacy Co.
     "By A. Thomson, Pt. Buyers.

"X. Destination to be declared by March 13th, 1916. Issued in duplicate. Please sign and return one copy to us."

The other two are in like terms, except as to dates, prices and times of delivery. In each count plaintiff alleged that grain sacks are a commodity having a market value, and that the market value of such sacks at Seattle and Tacoma was less by a stated amount on the date of actual delivery than at the agreed time of delivery, and demanded judgment in a sum so estimated.

By its answer, defendant admitted the making of the contracts, admitted that grain sacks had a market value, took issue as to the differences in market value at Tacoma and Seattle, at the times in question, and set up an affirmative defense to each cause of action, alleging that defendant is, and long has been, an importer and exporter of Calcutta grain sacks and other merchandise, transacting its business from its offices and warehouses in Victoria and Vancouver, British Columbia, and plaintiff is, and long has been, engaged in importing and exporting general merchandise, having its offices and place of business at Tacoma, Washington;

that defendant entered the three orders at the city of
Vancouver, British Columbia, and that it was agreed
that, should a higher or lower tariff than the ten per
cent ad valorem then prevailing be imposed, at the
times specified for delivery of the sacks, the specified
purchase prices should be proportionately increased
or diminished, such changes to be for the account of
the purchaser. It is next alleged that plaintiff, at the
times the orders were entered, well knew that it was
necessary for defendant to ship the sacks from its
warehouse at Vancouver or Victoria, British Columbia,
either to the port of Seattle or the port of Tacoma, in
the United States, and it was so contemplated by the
parties. Then appear allegations as follows:

"(4) The plaintiff proceeded with diligence to ful-
fill said orders, and in the early part of May, 1916, en-
deavored to export from ports in British Columbia
the sacks described in said orders, and to deliver the
same to the port of Seattle, and in the case of Exhibit
'C,' to the port of Tacoma, but it then discovered that
the governments of Canada and Great Britain had en-
acted, on or about the 6th day of May, 1916, and pro-
mulgated and proceeded to enforce laws and regula-
tions nonexistent theretofore, prohibiting the exporta-
tion from the Dominion of Canada or any of its prov-
inces of grain sacks or other jute products into the
United States of America, excepting by the consent of
the Canadian or British government obtained through
the embassy of Great Britain at Washington, D. C.,
and prohibiting the subjects of Great Britain and Can-
ada, and corporations organized under the laws of
Great Britain or Canada, or its provinces, under certain
penalties, from assisting in, or causing the importa-
tion of, grain sacks or other jute products into the
United States of America, except by the consent afore-
said.

"(5) The defendant, assisted by the plaintiff, pro-
ceeded with diligence to obtain the aforesaid consent
to the exportation of said sacks, as required by such
laws and regulations, in order to deliver said sacks to

the plaintiff, in accordance with such orders.   The efforts of the plaintiff and defendant to procure the aforesaid consent necessitated correspondence and interviews with officials of the Canadian government and representatives of the British embassy at Washington, D. C., Ottawa, Canada, and New York, N. Y., and such efforts, although diligently pursued, continued until about the 26th day of July, 1916, when such permission was finally obtained.   The defendant thereupon forthwith exported and delivered to the plaintiff the sacks referred to in the first and second causes of action, and tendered to the plaintiff delivery of the sacks described in the third cause of action.

"(6)   The delay in the delivery and tender of the sacks aforesaid was caused by the circumstances and conditions aforesaid, and was unavoidable on the part of the defendant and was beyond the control of the defendant, and could not have been avoided or foreseen by it by the exercise of ordinary prudence and care on its part."

A demurrer to this affirmative defense was sustained. Defendant abiding by its answer, the affirmative matter was stricken.   The cause was tried to the court without a jury.   The court found, in substance, that defendant had breached its contracts by failing to deliver the sacks at the times therein specified.   The market values of such sacks at Seattle and Tacoma, at the time of delivery fixed by the contracts and at the time of actual delivery, were admitted by stipulation of the parties, the aggregate decrease being $1,500. Judgment for plaintiff was entered for that amount. Defendant appeals.

Appellant assigns as error the striking of its affirmative defense, and the exclusion of evidence offered in its support.   It is argued (1) that the contract shows on its face that the parties contemplated that the sacks were to be imported into the United States from appellant's warehouses in British Columbia, and (2) that, if not so construed, the contract is so ambiguous

or incomplete in that respect as to make extrinsic evidence admissible to establish that intention.

I.   It is not contended that the contract, by its express terms, declares that the sacks were to be imported into the United States from British Columbia or anywhere else.  If that provision is to arise by implication, it must be from the circumstance that the letter-head on which the contract is written indicates that appellant has a business office in Vancouver, British Columbia, and from the provisions in the contract that delivery shall be made "Ex steamer Seattle—Tacoma," and that "this sale is based on the present customs tariff, viz.: 10 per cent ad valorem.  Any changes to be for account of purchaser."

The first mentioned circumstance requires but scant notice.  The fact that appellant had an office in Vancouver, appearing merely on its letter-head, was no part of the contract.  It is not mentioned in the contract, and cannot, even by the remotest implication, import into the contract a place of shipment not mentioned therein.  *Menz Lum. Co. v. McNeeley & Co.,* 58 Wash. 223, 108 Pac. 621, 28 L. R. A. (N. S.) 1007.

The second circumstance is hardly more potent to produce that effect.  True, delivery was to be made "Ex steamer Seattle—Tacoma," but this is obviously nothing more than a naming of the place of delivery with a reservation of the right to transport the sacks by water.  It neither expressed nor implies anything else.  It does not imply that they shall be shipped from Vancouver or any other specific port.  A shipment from Calcutta, San Francisco, or Portland would fully meet this provision and all that it implies.

The stipulation that "this sale is based on the present customs tariff, viz.: 10 per cent ad valorem.  Any changes to be for account of purchaser," is equally sterile of implicative force.  This stipulation would be

just as pertinent and operative if the contract, in terms, provided that the bags should be supplied from a stock already in the United States. A subsequent change of tariff would automatically, and just as certainly, affect the market price of such bags as it would the price of bags subsequently imported. Most certainly, also, this provision would be just as pertinent if the contract expressly provided that the bags should be imported from Calcutta direct. This provision, therefore, so far from implying that the bags were to be imported from certain warehouses in British Columbia, does not even imply that they were to be imported at all. Obviously, respondent could not have objected had appellant filled the orders by purchasing the necessary bags in Tacoma or Seattle, or any place else. Since no single provision found in the contract has any reasonable tendency to raise the implication contended for, it is obvious that, all together, they cannot have that cumulative effect.

II. Appellant asserts that the contract is ambiguous, but has failed to indicate a single ambiguous expression, and we are unable to find any. It is clear, terse and exact as to everything that it purports to cover.

Nor are we able to see wherein the contract is incomplete. As we said in the case of *Fairbanks Steam Shovel Co. v. Holt & Jeffery*, 79 Wash. 361, 140 Pac. 394, L. R. A. 1915B 477, touching a memorandum of sale no more complete than that before us: "The writing has every essential of a contract, parties, consideration, time, subject-matter, and mutual assent." And again, as we said in *Allen v. Farmers & Merchants Bank of Wenatchee*, 76 Wash. 51, 135 Pac. 621:

"The agreement cannot be called incomplete or ambiguous merely because it does not stipulate concerning every possible contingency which might arise. It

is sufficient, as a complete contract, if it stipulates fully and definitely concerning the things which, on its face, it contemplates.''

There is no merit in the claim that the contract is either ambiguous or incomplete merely because it does not stipulate where the bags should come from. That was a matter with which respondent had no concern. The written agreement shows on its face that it was prepared by appellant. If it then intended to be bound to ship the bags only from its warehouses in British Columbia, a thing so vital as to change the whole scope of its obligation, it is inconceivable that it would not have inserted that provision. The terse exactness with which appellant defined its undertaking in every other particular leaves hardly a doubt that it intentionally left this matter at large that it might be free to procure the sacks where, and ship them whence, it pleased. Moreover, the parties to every written contract, which on its face imports a complete legal obligation, are presumed to have introduced into it every material item and term. Silence on a point which might have been embodied does not open the door to parol evidence to include it.

''According to the better view the only criterion of the completeness of the written contract as a full expression of the agreement of the parties is the writing itself. If it imports on its face to be a complete expression of the whole agreement,—that is, contains such language as imports a complete legal obligation, —it is to be presumed that the parties introduced into it every material item and term; and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular one to which the parol evidence is directed. The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks.'' 3 Jones, Blue Book of Evidence, pp. 182, 183, § 440.

As said by the supreme court of New Jersey:

"But in what manner shall it be ascertained whether the parties intended to express the whole of their agreement in the written contract? The question is one for the court, for it relates to the admission or rejection of evidence. It cannot be assumed that the written contract was designed as an imperfect expression of the parties' agreement, from the mere fact that the written agreement contains nothing on the subject to which the parol evidence is directed. On that assumption that part of the rule which excludes parol proof as a means of adding to the written contract would be entirely abrogated. And to permit the parties to lay the foundation for such parol evidence by oral testimony that they agreed that that part only of their contract should be included in the written agreement, would open the door to the very evil against which the rule was designed to protect." *Naumberg v. Young,* 44 N. J. L. 331, 43 Am. Rep. 380.

See, also, *Thompson v. Libby,* 34 Minn. 374, 26 N. W. 1; *Hei v. Heller,* 53 Wis. 415, 10 N. W. 620; *Engelhorn v. Reitlinger,* 122 N. Y. 76, 25 N. E. 297, 9 L. R. A. 548; *Telluride Power Transmission Co. v. Crane Co.,* 208 Ill. 218, 70 N. E. 319; *Case v. Phoenix Bridge Co.,* 134 N. Y. 78, 31 N. E. 254; *Seitz v. Brewers' Refrigerating Mach. Co.,* 141 U. S. 510.

Appellant's affirmative defense, as we read it, does not allege that Calcutta bags could not be procured in the United States, or in other parts of the world and imported into the United States. It only avers that, under the embargo, they could not be imported from British Columbia. In the reply brief, it is claimed that, in the fourth paragraph of the answer which we have quoted, it is alleged that the British and Canadian embargo prohibited British subjects from importing, or assisting to import, from any place, grain sacks or other jute products into the United States. But, as we read it, that allegation, taken in connection with what

precedes it in the same paragraph and sentence, has relation only to importation from the Dominion of Canada and its provinces, and not to importations from other parts of the British Empire or countries foreign thereto. In any event, there is no semblance of an allegation that the sacks could not have been procured in the United States. This is not a case in which a subsequent law has made the contract as written invalid. But we are asked to write into it a provision which appellant deliberately left out of it, and which would render it obnoxious to a subsequent law. The dominant intention of the parties, as expressed in the contract, was a sale of Calcutta sacks to be delivered at a specified place and time. It was not a sale of such sacks from a designated stock or to be shipped from a designated place. Yet we are asked to imply an ambiguity or an incompleteness from terms plainly pertinent to the contract as written, in order to admit parol evidence to make this vital change in the contract. We can find no warrant in law for so doing. Unless all written contracts are ultimately to rest in parol, the affirmative defense tendered was no defense.

The judgment is affirmed.

WEBSTER, PARKER, MAIN, and FULLERTON, JJ., concur.