[Civil No. 3052. Filed September 24, 1931.]

[2 Pac. (2d) 1041.]

S. H. STEWART, as Trustee in Bankruptcy of the Estate of EDWARD GUY ATTAWAY, a Bankrupt, Appellant, v. SOUTHWEST COTTON COMPANY, a Corporation, Appellee.

Messrs. Sloan, Holton, McKesson & Scott and Messrs. Struckmeyer & Jennings, for Appellant.

Messrs. Moore & Shimmel, for Appellee.

LOCKWOOD, J.—S. H. Stewart, hereinafter called plaintiff, brought suit as trustee in bankruptcy of the estate of Edward Guy Attaway against the Southwest Cotton Company, a corporation, hereinafter called defendant, to enforce an implied agreement of a principal to reimburse his agent for losses sustained in carrying out his agency. The alleged agency was based upon an oral contract which was set forth in full detail in the complaint. Defendant filed a general demurrer, a special one raising the statute of limitations, and answered, setting up a written contract executed subsequent to the date of the alleged oral one set forth in the complaint, which written contract it pleaded was the only one ever made by the parties upon the subject matter set out in the oral contract. It also raised the question of the statute of limitations by a plea, in bar. The demurrers were overruled by the court, and the case went to trial before a jury.

At the trial Attaway was offered as a witness by plaintiff for the purpose of proving the contract declared upon. After certain preliminary questions were answered by the witness, defendant's counsel asked permission to question him on *voir dire* in order to lay the foundation for objections to further testimony. The request being allowed without opposition, the witness identified the signatures to the written contract relied on by defendant, and it was admitted in evidence without objection for the sole purpose at that time of laying a foundation for objections to testimony regarding the oral contract. Thereafter the jury was excused and the question of the admissibility of oral evidence to prove the oral contract set up in the complaint was argued. The jury was then called in and oral evidence offered tending to prove the contract pleaded. Objection

being made, the offer was refused, and the court thereafter directed a verdict in favor of defendant. From the verdict thus rendered and the judgment entered in accordance therewith this appeal has been taken.

There are four assignments of error, raising in effect but one question of law necessary for us to consider in determining the case, and that is whether or not on the record as made parol evidence was admissible to prove the alleged oral contract set forth in the complaint.

The general principles of the parol evidence rule are well set forth by Justice BAKER in the case of *S. H. Kress & Co.* v. *Evans*, 21 Ariz. 442, 189 Pac. 625, as follows:

"The law is very firmly settled that when parties have put their engagements into writing in such terms as import a legal obligation without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of the undertaking was reduced to writing, and all oral testimony of a previous colloquium between the parties, or of conversations or declarations at the time it is completed, or afterwards, is rejected."

Counsel for plaintiff do not question the rule as above stated, but claim it does not apply to the contract pleaded in this action for the reason that the written contract does not deal with the entire subject matter covered by the oral contract, and that parol evidence as to matters not included in the written contract is therefore admissible. This exception to the parol evidence rule is well recognized. 22 C. J., § 1713, and cases cited. The difficulty lies in determining whether or not the alleged oral contract does contain subject matter not covered by the written contract. By far the greater number of authorities hold that in order to make parol evidence of the terms of the oral

contract admissible it must first appear from the face of the written contract that it does not deal with the subject matter of the oral contract which it is desired to prove, and that parol evidence is not admissible for this preliminary proof. 22 C. J., § 1717, and cases cited. As was well said in the case of *Thomson etc. Co.* v. *Evans, Coleman & Evans*, 100 Wash. 277, 170 Pac. 578:

"Moreover the parties to every written contract, which, on its face, imports a complete legal obligation, are presumed to have introduced into it every material item and term. Silence on a point which might have been embodied does not open the door to parol evidence to include it.

" 'According to the better view the only criterion of the completeness of the written contract as a full expression of the agreement of the parties is the writing itself. If it imports on its face to be a complete expression of the whole agreement, that is, contains such language as imports a complete legal obligation, it is to be presumed that the parties introduced into it every material item and term; and parol evidence cannot be admitted to add another term to the agreement, although the writing contains nothing on the particular one to which the parol evidence is directed. The rule forbids to add by parol when the writing is silent, as well as to vary where it speaks.' 3 Jones Blue Book of Evidence, § 440, pp. 182, 183.

"As said by the Supreme Court of New Jersey:

" 'But in what manner shall it be ascertained whether the parties intended to express the whole of their agreement in the written contract? The question is one for the court, for it relates to the admission or rejection of evidence. It cannot be assumed that the written contract was designed as an imperfect expression of the parties' agreement, from the mere fact that the written agreement contains nothing on the subject to which the parol evidence is directed. On that assumption, that part of the rule which excludes parol proof, as a means of adding to the written contract, would be entirely

abrogated. And to permit the parties to lay the foundation for such parol evidence by oral testimony that they agreed that that part only of their contract should be included in the written agreement would open the door to the very evil against which the rule was designed to protect.' *Naumberg* v. *Young,* 44 N. J. Law, 331, 339, 43 Am. Rep. 380.

"See, also, *Thompson* v. *Libby,* 34 Minn. 374, 377, 26 N. W. 1; *Hei* v. *Heller,* 53 Wis. 415, 417, 10 N. W. 620; *Engelhorn* v. *Reitlinger,* 122 N. Y. 76, 81, 25 N. E. 297, 9 L. R. A. 548; *Telluride Power & Trans. Co.* v. *Crane Co.,* 208 Ill. 218, 226, 70 N. E. 319; *Case* v. *Phoenix Bridge Co.,* 134 N. Y. 78, 81, 31 N. E. 254; *Seitz* v. *Brewers' etc. Co.,* 141 U. S. 510, 517, 35 L. Ed. 837, 12 Sup. Ct. Rep. 46."

It is true other cases hold that under certain circumstances this preliminary showing may be made by parol evidence of the surrounding facts and circumstances attending the execution of the written contract. *Clark* v. *Townsend,* 96 Kan. 650, 153 Pac. 555; *Strickland* v. *Johnson,* 21 N. M. 599, 157 Pac. 142; *Sund & Co.* v. *Flagg & Standifer Co.,* 86 Or. 289, 168 Pac. 300. On examining the various cases, however, the difference seems rather apparent than real, and we think most, if not all, of them can be reconciled by the use of the method which is well stated in the case of *Bryant* v. *Bryant,* 295 Pa. 146, 144 Atl. 904, as follows:

"The test, to determine whether an alleged parol agreement, by which it is proposed to modify the expressed understanding, comes within the field embraced by the writing, is to compare the two and determine whether parties, situated as were the ones to the contract, would naturally and normally include the one in the other, if it were made. *Wagner* v. *Marcus,* 288 Pa. 579, 136 Atl. 847."

We think this a more satisfactory index for the use of the trial judge than whether or not the particular element of the alleged extrinsic negotiation

is dealt with *specifically* in the written contract. The common experience of mankind teaches us that whenever parties reduce their understanding to the form of a solemn written agreement, it is but natural that they will include in the writing every matter naturally cognate to the agreement, particularly those conditions requiring affirmative action by either party. When, therefore, it is attempted to prove an oral agreement to perform some affirmative, specific act in regard to a general subject which was obviously from the face of the written contract in the minds of the parties when the written contract was made, the better rule is that oral evidence of such alleged agreement should be excluded.

Let us then compare the written contract with the alleged oral contract, and see whether the latter sets up an agreement which parties dealing with the matters shown on the face of the written contract would naturally and normally include within it if in fact such agreement was made. The written contract, so far as is necessary to quote it for the purposes of this opinion, reads as follows:

"This Agreement, . . . between the Attaway-Phelps Cotton Company, a copartnership composed of E. G. Attaway and M. C. Phelps, . . . party of the first part, and the Southwest Cotton Company, a corporation . . . party of the second part, Witnesseth:

"Whereas, the party of the first part is engaged in the business of conducting and operating in the Salt River Valley, certain cotton gins; and

"Whereas, the party of the second part is engaged in a similar business and in addition thereto is engaged in the business of buying cotton; and

"Whereas, the party of the second part desires to enter into arrangements whereby the party of the first part will, during what is commonly known and designated as the 1920–21 cotton season, purchase cotton exclusively for and on behalf of the party of the second part, except as hereinafter provided; and

"Whereas, the party of the first part is willing to enter into such an arrangement providing it receives compensation therefor.

"Now, Therefore, . . . the parties . . . agree as follows, to-wit:

"(1) The party of the first part agrees that it will, during the term of this agreement maintain and operate, under its own regulations, its certain two cotton ginning plants, the one being situate at Mesa and the other at Gilbert, Arizona, *and that it will from time to time make crop loans to cotton growers,* and as security for said loans, it agrees to take from the said grower or growers a crop mortgage or mortgages which said crop mortgage or mortgages shall in each instance contain a provision to the effect that such grower will harvest and gather the crop of cotton and its products and forthwith deliver the same to the mortgagee at one of its gins to be ginned and baled by the mortgagee; that the said chattel mortgage or mortgages shall contain an additional provision to the effect that the mortgagee shall have the privilege of purchasing the said cotton and the seed at the market price. . . .

"(2) During the time the party of the second part is in the open market purchasing cotton, the party of the first part during the life of this contract, agrees to purchase cotton, upon the terms herein specified, from the various grower or growers and in turn the party of the first part agrees to sell the same, on the terms hereinafter mentioned, to the party of the second part, who in turn agrees to buy and purchase the same. . . .

"(4) In addition to the prices as computed in a, b, c, d and e of Paragraph 3, (*being current market prices*) the party of the second part agrees to pay to the party of the first part as follows:

"(a) All lint cotton at the time of its purchase situate on the gin yards of the party of the first part situate at either the towns of Mesa or Gilbert, shall be paid for by the party of the second part to the party of the first part on a basis of one cent (1¢) per pound. The price of 1¢ per lb. on all lint cotton purchased, as herein provided, shall include and fully

cover services rendered, or charges made for marking and loading cotton on board the cars.

"(b) All cotton at the time of its purchase situate on the gin yards owned or controlled by people other than the party of the first part or the party of the second part, shall be paid for by the party of the second part to the party of the first part on a basis of a commission of One Dollar ($1.00) per bale. The commission of $1.00 per bale, as herein provided, shall not include nor cover services rendered, or charges made for marking and loading cotton f. o. b. cars. . . .

"(6) The covenants and agreements herein contained shall be in full force and effect as between the parties hereto during what is commonly known and designated as the 1920–21 crop year. . . .

"ATTAWAY–PHELPS COTTON COMPANY,
"By [Signed] E. G. ATTAWAY,
"Party of the First Part.
"SOUTHWEST COTTON COMPANY,
"By [Signed] EDWARD F. PARKE,
"Vice-President and General Mgr.
"Party of the Second Part."

(Italics ours.)

The oral contract declared upon by plaintiff is substantially in all important matters the same in legal effect as the written contract, with the vital exception that, whereas the written contract provides that the Attaway & Phelps Cotton Company should from time to time make crop loans to the cotton growers, but nowhere intimates that the Southwest Cotton Company was in any way interested in or responsible for such loans, the complaint alleges the oral contract on that subject to have been as follows:

"Further said Southwest Cotton Company proposed to said Attaway & Phelps Cotton Company that in order to insure a large production of long staple cotton and a large supply of long staple cotton for optioning and purchasing as aforesaid said Attaway & Phelps Cotton Company should further act as its agent in the financing of cotton growers in the vicinity in which said Attaway & Phelps Cotton

Company was doing business who might need financial aid during the season of 1921 for the growing of said long staple cotton, and that to this end said Attaway & Phelps Cotton Company should arrange for and negotiate loans to such growers, and to encourage and stimulate the largest possible planting of long staple cotton by said growers said Attaway & Phelps Cotton Company should promise and agree to supply such growers for said season with sufficient money to enable them to properly plant, care for and harvest such crops as they might plant. . . .

"Further it was proposed that the money required in the making of said loans should be furnished by said Southwest Cotton Company to said Attaway & Phelps Cotton Company through the medium of said Salt River Valley Bank."

The whole suit is based upon the theory that the Southwest Cotton Company agreed to provide the Attaway & Phelps Cotton Company, as its agent for that purpose, with the funds to make all necessary loans to cotton growers who would give options on their cotton, and that the latter company, relying on such promise, borrowed in its own name from the Salt River Valley Bank enough money to make the loans; that the Southwest Cotton Company failed to provide funds for such loans in the amount required, or to reimburse the Attaway & Phelps Cotton Company for the sums which it had so borrowed and reloaned as agent aforesaid, and that by reason of such failure plaintiff was damaged in the amount set forth in the prayer of the complaint.

All the other matters pleaded in the complaint are merely details of the methods in which it is alleged the business was to be handled, and need not be considered. If, as a matter of fact, the Southwest Cotton Company did agree to provide funds for the Attaway & Phelps Cotton Company as its agent, to make the loans which the latter did make to the cotton growers, and failed to do so, it would, of course, be

liable to the latter for any damages caused thereby. If, on the other hand, it did not agree to provide funds for such loans, no liability exists under the pleadings. The question then is: Is the oral agreement to provide such funds, pleaded in the complaint, such an alteration or modification of the written contract as to bring it within the parol evidence rule, or is it, as claimed by plaintiff, an independent agreement, distinct and separable from and additional to the terms of the written instrument, so that parol evidence of its terms is admissible?

Using the test above set forth, we are of the opinion the trial judge correctly held the vital provision of the alleged oral contract was within the parol evidence rule. The written contract provides for two things: First, that the Attaway & Phelps Cotton Company should purchase certain cotton options which defendant agreed to repurchase on fixed and definite terms, and, second, that the Attaway & Phelps Cotton Company should make loans to cotton growers for the purpose of aiding it in securing these options. We think an agreement so vitally important to the making of the loans as that set forth in the alleged oral contract was one which parties situated as were the ones to the written contract would naturally and normally include in that contract, if it actually were made.

The trial court therefore correctly excluded any parol evidence tending to show an agreement on the part of defendant to provide the funds from which the Attaway & Phelps Cotton Company was to make loans to the cotton growers. Such being the case, it is obvious there was no evidence before the jury from which they could legally find the existence of the fact which was essential to sustain a recovery by plaintiff, and the trial court properly instructed a verdict in favor of defendant.

In view of what we have just stated, it is unnecessary to discuss the other questions raised on the appeal.

The judgment of the superior court of Maricopa county is affirmed.

McALISTER, C. J., and ROSS, J., concur.