**BLAKE v. PARAMOUNT PICTURES, Inc., et al.**

No. 8173—Y.

District Court, S. D. California, Central Division.

Jan. 31, 1938.

Neblett & Warner and Wm. Moseley Jones, all of Los Angeles, Cal., for plaintiff.

O'Melveny, Tuller & Myers, Walter K. Tuller, Pierce Works, and Jackson W. Chance, all of Los Angeles, Cal., for defendants.

YANKWICH, District Judge.

This is one of a group of twenty cases originally begun in the superior court of California by different plaintiffs against the same defendants and removed to this court. Our jurisdiction depends entirely upon diversity of citizenship. 28 U.S.C.A. § 41(1). Except for the difference in plaintiffs, the complaints are the same. They are complaints for damages and have two counts.

The facts pleaded in the first count are these:

The plaintiff is an exhibitor of motion pictures. We shall refer to him as "the exhibitor." The defendants Paramount Pictures, Inc., Paramount Pictures Distributing Company, Inc., and numerous fictitious defendants are engaged in the business of producing and distributing motion pictures in Los Angeles county, Cal. We shall refer to them as "the distributor." The named defendants and seven other companies, together known as the "Big Eight," produce more than 75 per cent. of all feature motion pictures exhibited in the United States and enjoy a practical monopoly in the matter in California and in the United States. Because of this monopolistic control, exhibitors of motion pictures, such as plaintiff, cannot stay in business unless they purchase motion pictures upon terms dictated by the defendants. The defendants and others through affiliation in an association known as the "Motion Pictures Producers and Distributors of America" co-operate to reduce and eliminate competition in the motion picture industry. To that end, they conspire to harass, embarrass, and damage independent theater owners, such as plaintiff, in order to eliminate competition with theaters owned and controlled by the organization. The monopoly is made more complete by extensive ownership of theaters in California, which are engaged in exhibiting motion pictures in competition with the plaintiff. To these motion picture theaters they give more favorable terms than to the independents, such as plaintiff. A uniform business policy relating to exhibition of pictures is maintained, exemplified by a uniform form of contract into which independent exhibitors must enter. The motion picture season is made to begin on August 1 of each year and to end on July 31 of the following year. Each company produces forty to sixty-five leading feature pictures during each season. No exhibitor is permitted to purchase by selecting one or more titles from the product of any of the companies. Instead, at the beginning of each motion picture season, the companies send out their salesmen to solicit the exhibitors. Each exhibitor is given the option of contracting *"for a block of certain titles,"* under terms and conditions thereafter set forth. Defendants are all a trust and combination of capital dominated by identical persons and financial interests. The plaintiff is the operator of a motion picture theater. In order to conduct his business, he had to secure pictures for the season of 1936–1937 from the defendants. In order to do so, he was required to enter into a standard contract for block booking. Prior to the execution of the contract, it was represented by the defendants, *directly* and through agents, and advertisements, that during the season they would deliver the following special group of motion pictures: "Souls At Sea" (with Gary Cooper and George Raft); "Artists and Models" (with Jack Benny, Ida Lupino, Richard Arlen, Gail Patrick); "Angel" (with Marlene Dietrich, directed by Ernst Lubitsch); "High, Wide and Handsome" (with Irene Dunne and Randolph Scott); "Spawn of the North" (with Carole Lombard, Cary Grant, Randolph Scott—directed by Henry Hathaway, who did "Lives of a Bengal Lancer" and "Trail of the Lonesome Pine"); "The Count of Luxembourg" (with Irene Dunne, John Boles, W. C. Fields, and Frank Forrest; Frank Lehar's world-famous operetta with the original glorious Lehar music); "The Barrier" (with Jimmy Ellison, Jean Parker, Randolph Scott, Frances Drake, Bob Burns, George Bancroft); one additional motion picture starring Marlene Dietrich; one additional motion picture starring Claudette

Colbert; one motion picture starring Harold Lloyd; and one additional motion picture starring Gary Cooper. The representations as to these productions were false and untrue, were known as such by the defendants; and were made for the fraudulent purpose of deceiving and misleading the plaintiff and without any intention on the part of the defendants to perform them. The plaintiff relied on them and was induced thereby to enter into the contract. He would not have done so had the representations not been made. This was part of a fraudulent scheme to defraud and damage plaintiff. Pursuant to it, the defendants, without just cause or reason, refused to produce and release for exhibition any of the particular motion pictures mentioned. On the contrary, they withheld production and distribution fraudulently and, at the end of the season, sought to sell them for the following season at an increased rental. This fraud was practiced on all independent motion picture owners and exhibitors as well as the plaintiff who, by reason of the act, has been damaged in the sum of $3500.

A general and special demurrer challenges the sufficiency of this count.

■ One of the grounds of challenge is that, because the contract, which is denominated a "standard license agreement," contains the usual clause that no other representation had been made other than those expressed in it, no cause of action for damages for fraud and deceit lies. We are asked to apply to the facts here the principle declared by the Supreme Court of California in a group of recent cases that, when a contract is entered into through agents and distinctly excludes terms and representations not specified, no action for damages against the principal lies, but only an action for rescission. See Speck v. Wylie, 1934, 1 Cal.2d 625, 36 P.2d 618, 95 A.L.R. 760; Lozier v. Janss Investment Co., 1934, 1 Cal.2d 666, 36 P.2d 620; Harnischfeger Sales Co. v. Coats, 1935, 4 Cal. 2d 319, 48 P.2d 662. But we cannot so apply it. For, whatever may be the proof at the trial, the complaint alleges that the representations were made "either *directly* or through authorized agents." The cases cited do not deny relief through an action in deceit for the fraud of the principal himself, or that of the "managing officers where the seller is a corporation." See Wedge v. Security First National Bank, 1933, 219 Cal. 113, 25

P.2d 411, 412; Speck v. Wylie, supra; Lozier v. Janss Investment Co., supra.

■ But the first count is vulnerable for other reasons. It is clearly a count in fraud and deceit. Counsel for the plaintiff disclaim, in their brief, any intention to consider it otherwise. The kind of fraud it charges is that denounced by subdivision 4 of section 1710 of the California Civil Code. The section, after referring to the actionable deceit, declared by section 1709 of the Civil Code, defines it (in subdivision 4) as "A promise, made without any intention of performing it." This form of deceit has been a part of the law of California since the beginning of its legislative history. And courts have had repeated occasions to interpret its meaning. While a mere unperformed promise does not constitute fraud (Brison v. Brison, 1888, 75 Cal. 525, 17 P. 689, 7 Am.St.Rep. 189; O'Brien v. O'Brien, 1925, 197 Cal. 577, 241 P. 861; Jacobson v. Mead, 1936, 12 Cal.App. 2d 75, 55 P.2d 285, 1267), many actions have been entertained under this provision where damages flowed from promises made without intention to perform. And the more recent cases show great liberality in this respect. See Wiberg v. Barnum, 1929, 99 Cal.App. 323, 278 P. 871; Masten v. Fox West Coast Theaters, 1931, 117 Cal.App. 303, 3 P.2d 610; Benson v. Hamilton, 1932, 126 Cal.App. 331, 14 P.2d 876; Reton v. J. D. Millar Realty Co., 1933, 132 Cal.App. 708, 23 P.2d 419; Graham v. Los Angeles First National Trust & Savings Bank, 1935, 3 Cal.2d 37, 43 P.2d 543; Bechtel v. Baglieto, 1936, 13 Cal.App. 2d 495, 57 P.2d 192; Cutler v. Bowen, 1935, 10 Cal.App.2d 31, 51 P.2d 164. In all these cases and others which might be cited, the fraudulent promise was not carried over into the contract. The contract simply *did not* contain it or contained one in conflict with it. Here, while the contract did not specifically designate the particular pictures which were to be made, it referred to them in the schedule which forms the thirty-second clause of the contract as being: "Distributor's Group S-8 motion pictures of feature length, not to exceed sixty-five (65), which shall be generally released by the Distributor for distribution to motion picture theatres in the United States during the year commencing August 1, 1936, and ending July 31, 1937, except the motion pictures as to which Distributor Producer thereof, or other party to the terms and conditions of licensing the

exhibition thereof and except Paramount's six (6) Hopalong Cassidys."

This, presumably, includes all the motion pictures as to which the representations are alleged to have been made. The complaint so interprets this clause in paragraph VII of this count. The method of sale is described as follows: "Some time prior to the beginning of each motion picture season, as hereinbefore arbitrarily determined, the defendants and each of said other companies send out their respective salesmen to solicit the various exhibitors with advertisements of the projected pictures, and then each exhibitor is given the option of contracting '*for a block of said titles*' on the terms and conditions hereinbefore set forth, or not getting any pictures at all."

So it is evident from the very wording of the license agreement, and its interpretation by the parties, that, for the particular year, it called, among other things, for *the block of productions*, the nondelivery of which is the chief ground of complaint here. But the producer-distributor, evidently anticipating that he might not be able to produce the particular productions or that he might not desire to market them within the year or for other reasons,—perhaps it was the reason advanced by the plaintiff that the distributor might desire to ask a greater price for them later, which, in itself, is merely an incident to the exercise of economic power over production,—reserved to himself the right of substitution. This is contained in paragraph A of the twentieth clause of the agreement reading:

"Description of Pictures—Twentieth:

"The Distributor shall have and hereby reserves the right in the sole discretion of the Distributor to change *the title of any of said motion pictures*, to make changes in, alterations and adaptation of any story, book or play and to substitute for any thereof any other story, book or play. The Distributor also shall have and hereby reserves the right to change the director, the cast or any member thereof of any of said motion pictures." (Italics added.)

In addition to this, the exhibitor protected himself against delay or failure of delivery by providing, in clause second (b) and third (c), for liquidated damages to the exhibitor, equivalent to rentals.

So here we do not have either the failure of a contract to express an oral promise or the case of an oral promise in conflict with a written promise. The written promise relates to the very motion pictures which the plaintiff says were promised, although they are not designated by name. But that they were in the contemplation of the parties is indicated by the provision for substitution. "The title of any of the *said motion pictures*" could mean only one thing: Not an *unnamed group* of motion pictures, but motion pictures to which the agreement related, and the title of which *had been disclosed to the exhibitor*. As to these, the distributor reserved the right not only to change the title but also the story, book, or play and to substitute others as well as to change members of the cast (including the star) and director. The clause becomes meaningless unless we postulate the proposition that the parties were contracting with reference to certain designated and contemplated productions. For, if they were not, the schedule designating the motion pictures in a general way would have been sufficient protection to the distributor in case of change in the production schedule, or inability to produce certain features, star certain actors, or employ certain directors, during the duration of the contract.

■ To be fraudulent as having been made without intention to perform, a promise must be specific, definite. If, instead, we have an alternative promise, no actionable fraud can result unless it is alleged that it also was made without the intention to perform.

The complaint does not even refer to the substitution clause.

And while it is true, as claimed by the plaintiff, that, the action being in fraud, the contract is merely an incident, it is an *all-important* incident; because it is for the fraud in inducing it that the action is brought. If the fraud had not brought about the execution of the contract and the consequential damage, there would be no actionable wrong. Here the damage is alleged to have been caused by the failure to deliver the specific motion pictures within the period of the contract. So the contract cannot be disregarded. The plaintiff does not disregard it, for by reference he makes it a part of his complaint.

■ Here we find *not* an oral representation, omitted from the contract, but a contract in which the parties deal specifically with the matter of the oral representation, and change what might have been an absolute promise into an alternative one, giving

one of the parties to the contract the right to substitute another production for one promised. The contract as written is not silent as to the representations or complementary to them. It *covers* the representations, but specifically provides that, certain contingencies happening, the distributor is not to be bound by them. When this is the case, the other contracting party who complains of misrepresentation must charge fraud in inducing him to sign a contract which did not express the oral promises or representations. See California Trust Co. v. Cohn, 1932, 214 Cal. 619, 7 P.2d 297. Or he must allege that the substituted promises were also made without the intention to perform.

 It is elementary that, if one promise to do one thing, or, failing, do another, no fraud can result if he made the original promise only without intention to perform; for even if he did, he protected himself by the substitution. And he who has agreed to accept something else for the original promise cannot complain of the fraud in the making of the first one only. Otherwise, the right to elect between alternative obligations would be nullified. This is an important right, codified into the law of California. When an obligation calls for the performance of one of two acts, in the alternative, the person required to perform has the right to choose. California Civil Code, § 1448. He loses this right only if he fails to give notice, at the time fixed by the obligation, or before time of performance. In which event, the right of selection passes to the other party. California Civil Code, § 1449; and see Dittrich v. Gobey, 1898, 119 Cal. 599, 51 P. 962; Consolidated Adjustment Co. v. Superior Court, 1922, 189 Cal. 92, 207 P. 552; Dozier v. National Borax Co., 1918, 35 Cal.App. 612, 170 P. 638; Whims v. Marco, 1934, 137 Cal.App. 750, 31 P.2d 475. *Only upon the exercise of the right of election, either by the promisor or by the other side, to whom the right may pass upon his failure, does the obligation become absolute and determinate.* See Norris v. Harris, 1860, 15 Cal. 226, 258. These principles are merely a codification of principles recognized generally in the law of contracts. See 13 Corpus Juris 629; Foster v. Goldschmidt, 1884, C.C.N.Y., 21 F. 70. The party having the right of selection can be charged with breach of alternative obligations, only when he fails to perform both. And,

where the obligation indicates clearly that it contemplates the performance of one only of two acts, in the alternative, no fraud, under subdivision 4 of section 1710 of the Civil Code, can exist unless both promises were made without intention to perform. Or the promisor is guilty of other acts amounting to fraud which led to the execution of the written contract with the substituted clause in it. California Trust Co. v. Cohn, supra.

Absent these allegations, the first count of the complaint is vulnerable. The demurrer will be sustained.

The second count reincorporates the allegations which have already been epitomized. Then it is alleged that the object of these acts was to increase the price of the motion pictures and prevent competition in their sale and purchase by the plaintiff. And these additional facts are given: This was done for the purpose of restricting trade and commerce in the distribution and exhibition of motion pictures. At the end of the contract periods, the defendants offered to sell some or all the motion pictures for exhibition at higher prices than provided in the contract. This, in violation of the Anti-Trust law of California, commonly known as the Cartwright Act, St.Cal.1907, p. 984, amended St.1909, p. 593. The penalties of that act, double the damages, are sought.

The social policy behind anti-trust legislation was summed up by Mr. Justice McReynolds in Paramount Famous Lasky Corporation et al. v. United States, 282 U. S. 30, 42, 51 S.Ct. 42, 44, 75 L.Ed. 145:

" 'Founded upon broad conceptions of public policy, the prohibitions of the statute (Sherman Act [15 U.S.C.A. §§ 1–7, 15 note]) were enacted to prevent not the mere injury to an individual which would arise from the doing of the prohibited acts, but *the harm to the general public which would be occasioned by the evils which it was contemplated would be prevented,* and hence not only the prohibitions of the statute, but the remedies which it provided, were coextensive with such conceptions.' Wilder Mfg. Co. v. Corn Products Co., 236 U.S. 165, 174, 35 S.Ct. 398, 401, 59 L.Ed. 520 [Ann.Cas.1916A, 118]. 'The purpose of the Sherman Act is to prohibit monopolies, contracts and combinations which probably would *unduly interfere with the free exercise of their rights by those engaged, or who wish to engage, in trade and commerce—in a word to preserve the right of*

*freedom to trade.'* United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992, 7 A.L.R. 443. 'The fundamental purpose of the Sherman Act was to secure *equality of opportunity and to protect the public against evils* commonly incident to destruction of competition through monopolies and combinations in restraint of trade.' Ramsay Co. v. Associated Bill Posters of U. S. and Canada, 260 U.S. 501, 512, 43 S.Ct. 167, 168, 67 L. Ed. 368. 'The Sherman Act was intended to secure *equality of opportunity,* and to protect the public against evils commonly incident to monopolies, and those abnormal contracts and combinations which tend directly to suppress the conflict for advantage called competition—the play of the contending forces ordinarily engendered by an honest desire for gain.' United States v. American Oil Co., 262 U.S. 371, 388, 43 S.Ct. 607, 611, 67 L.Ed. 1035." (Italics added.)

And see People v. Sacramento Butchers' Ass'n, 1910, 12 Cal.App. 471, 107 P. 712; Poultry Producers of Southern California, Inc. v. Barlow, 1922, 189 Cal. 278, 208 P. 93.

█ In brief, the Cartwright Act, before its amendment, prohibited, as trusts, any combination of capital, skill, or acts aiming to create or carry out restrictions in trade or commerce, to limit or reduce the production or increase the price of merchandise or of any commodity, to prevent competition in manufacturing, making, transportation, sale, or purchase of merchandise, products, or any commodity, to fix, for control purposes, standards for the control of prices, or to enter into agreements aiming to maintain prices.

By an amendment approved March 20, 1909, St.1909, p. 593, there was excepted from the effect of the statute any combination or association "the object and business of which are to conduct its operations at *a reasonable profit* or to market at a reasonable profit those products which *cannot otherwise be so marketed."*

An identical provision in the Colorado anti-trust act was declared invalid by the Supreme Court in Cline v. Frink Dairy Co., 1927, 274 U.S. 445, 47 S.Ct. 681, 684, 71 L. Ed. 1146. Mr. Chief Justice Taft, speaking for a unanimous court, held that: "Such an exception in the statute leaves *the whole statute without a fixed standard* of guilt in

an adjudication affecting the liberty of the one accused." (Italics added.)

To my mind, this decision is controlling. On the basis of it, while a judge of the superior court of California, in an opinion (The Texas Co. v. Vedder) filed March 8, 1931, I so held. This opinion having been called to the attention of counsel for the plaintiff at the oral argument, they insist that, as the original Cartwright Act was declared constitutional (See People v. Sacramento Butchers' Ass'n, supra), the invalidity, if any, affects the amendment only.

█ Time does not permit a study of the history of the Colorado Act which the Supreme Court had under consideration in Cline v. Frink Dairy Co., supra. Hence we do not know whether the proviso was a part of the original act or not. But, to our mind, this is unimportant. It is true that clauses in a statute which are severable may be declared invalid and the statute itself stand. See Champlin Refining Co. v. Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403. But there is no way of segregating the proviso from the definition. It was intended to affect the acts denounced as crimes. It being invalid, as introducing an uncertain element into them, the acts denounced cease to be illegal, and no penalty, civil or criminal, can be bottomed on them. See United States v. L. Cohen Grocery Co., 1921, 255 U.S. 81, 41 S.Ct. 298, 65 L. Ed. 516, 14 A.L.R. 1045; Connally v. General Construction Co., 1925, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322; Small Co. v. American Sugar Refining Co., 1925, 267 U.S. 233, 45 S.Ct. 295, 69 L.Ed. 589. This makes it impossible to save the act by imputing to the Legislature, as bidden by the plaintiff, the intention not "to invalidate the remainder of the act in the event the amendment was void." The truth is, the amendment was approved on March 20, 1909, the decision on constitutionality was rendered on January 22, 1910, and did not become final until March 23, 1910. Of course, unconstitutionality is never presumed. Every intendment is the other way. It is assumed that Legislatures do not *deliberately* pass acts violative of constitutional provisions. Often Legislatures guard themselves against contingencies by inserting separability clauses in statutes. Courts give effect to such clauses if the challenged portion can be removed from the act and "what is left is fully operative

as a law." Champlin Refining Co. v. Commissioner, supra, 286 U.S. 210, 52 S.Ct. 559, 565, 76 L.Ed. 1062, 86 A.L.R. 403. No separability clause accompanied the enactment of this amendment. We can surmise, in the light of legislative experience, what happened. The statute of 1907 was deemed to be too drastic. And, no doubt, certain groups, frightened by its sweeping range, sought to modify it by a redefinition of the acts denounced, which would eliminate them. The Legislature heeded their appeal and exempted from the operation of the entire statute the acts of those operating at a reasonable profit, or marketing products which could not be marketed otherwise. We may assume that the object was laudatory and that it probably aimed to save the co-operative agricultural groups, which even then were quite common in California. None the less, when the Legislature introduced these elements, the entire act became void for uncertainty, under the decision in Cline v. Frink Dairy Co., 1927, supra. If the amendment has the effect of invalidating a beneficial statute which otherwise would have been valid, the resulting harm should be laid at the door of the legislators.

In view of this invalidity, the second count must fall.

The demurrer to it will be sustained.

Exception to the plaintiff.

Leave is granted to plaintiff to amend within twenty days, if so advised.

The motions to strike are put off calendar.

The clerk will enter this order in all other cases submitted at the same time.