453 P.2d 972

Emilia BERRY, a single woman, and Aida Berry, a single woman, Appellants,

v.

Robert G. ROBOTKA, a single man, Appellee.

No. 2 CA–CIV 620.

Court of Appeals of Arizona.

April 28, 1969.

Nell W. Burt, Douglas, for appellants.

Gentry, McNulty, Toci & Borowiec, by Thomas A. Thode, Bisbee, for appellee.

MOLLOY, Chief Judge.

This is an appeal from a summary judgment denying the plaintiffs a rescission of a contract for the sale of real estate. The only contention made on appeal is that there was a question of fact open as to whether this sale was induced by "fraud and misrepresentation."

Plaintiffs are two elderly, unmarried sisters residing in Los Angeles. On March 15, 1967, after nearly a year of negotiations, they executed a written agreement to sell a 160-acre ranch near Willcox, Arizona, to the defendant, a young businessman then residing in Phoenix. The property is called "Star Ranch," and the plaintiffs profess to have a strong sentimental attachment to it.

The complaint filed by the plaintiffs alleges that a contract for the sale of this property was executed on March 15, 1967, by which the plaintiffs agreed to sell the property to the defendant for $14,000, that they executed a quitclaim to the property on March 31, 1967, and that they mailed this deed to a law firm in Willcox, Arizona, which law firm was " * * * acting as agent and representative of the defendant * * * ". Subsequently, according to the complaint, these sisters directed this law firm not to record the deed, but, contrary to these instructions, the deed was recorded. The complaint further alleges that they had been notified that the Arizona Highway Department needed a portion of this land for highway purposes and that the defendant offered to " * * * represent these plaintiffs * * * " in their dealings with the Highway Department if they would sign the agreement of sale and the quitclaim deed.

The complaint alleges further:

"That in all of the preliminary negotiations between these parties, it was understood and specifically agreed by the defendant, that the sale of this property would be only for a temporary time; that the defendant would live on the place, keep it in repair, make certains [sic] improvements, and then reconvey the property to these plaintiffs, at which

time they would refund the purchase price, together with the cost of all improvements made by him, to the defendant. That this condition was not included in any of the three earnest money agreements which were prepared at the instance of defendant * * * as these plaintiffs are not versed in the preparation of such legal documents, they relied upon the statements of this defendant that he would re-convey the property to them at any time they requested; and, when they were notified by telephone by this defendant that unless they signed immediately they would face a lawsuit from the Highway Commission, not only for the conveyance of such property but for damages for delaying the construction of the highway, they signed, first, the agreement, and then the deed. That these plaintiffs were assured, time and time again, that the promise of defendant to re-convey, was just as binding on him as if it were written in the agreement; that they relied upon these statements made by him, and for this reason alone executed the agreement and deed."

There is no allegation in the complaint that the defendant did not intend to perform any promises that might have been made by him nor are there any general allegations of fraud. The complaint is signed by the plaintiffs' counsel, and is not verified by either of the plaintiffs.

After filing of an answer which denied that there were any promises to reconvey in connection with this sale, and which raised as an affirmative defense the statute of frauds, there was a motion for summary judgment filed by the defendant, which had appended thereto affidavits of the defendant and of the attorney employed to close this sale, to which affidavits were attached numerous letters reflecting correspondence between the sellers, the buyer, the attorney and the Arizona Highway Department, all pertaining to this sale. The affidavit of the buyer categorically denies that there was any promise to reconvey.

The affidavit of the attorney states, *inter alia,* that he first learned of any contention of such a promise almost a year after the sale. The letters written by the plaintiff sisters are lengthy and set forth in detail their reasons for selling the property to the defendant and their reasons for wanting it back. These letters are not consistent with the allegations of the complaint that this sale was induced by a promise to reconvey. There is no suggestion in this correspondence of any such promise until a letter of June 14, 1967, some three months after the contract of sale was made.

Among the statements found in these various letters which are pertinent are:

"Dec. 22, 1966 [83 days before the contract of sale]

"Dear Mr. R. Robotka,

"* * * We hope that you will soon hitch your horse to the Star Ranch gate.

"We prefer you as a buyer, because you have been so highly recommended, as a person of integrity and purpose, and with a kindly attitude to restore the home at Star Ranch. We have not wanted to sell it to anyone, who was only interested in the land. * * *

"Nothing will make us happier, than to see Star Ranch made into a lovely home again, as it used to be. * * *

"Fourteen thousand dollars may seem high to you but in the long run, it will not seem so high, * * *

"About two weeks ago, Stark Riggs phoned and said that he would be willing to pay $16,000 cash for Star Ranch. * * *

* * * * * *

"* * * We would rather not sell Star Ranch to them, or to anyone who is not interested in the house but only in the land. We want the buyer to repair and restore the house because it is yet repairable. * * *

"We do hope that you decide to buy Star Ranch. We would rather sell it to you for 14,000 cash 'as is' which is 2000

**464**

less than what Stark offered. * * * They all know that it was originally valued at 30,000. According to the rising value of land and property, the market price is still about 30,000, although we do not ask that much for it now.

* * * * * *

/s/ "Emilia and Aida Berry" "Jan. 28, 1967 [46 days befor the contract of sale]

"Dear Mr. Robotka:

"We are glad that you are deciding to buy Star Ranch. We are most sincere in our assurance to you, that you will not make a mistake in buying Star Ranch, * * *

"*It is also a good investment.* We are willing to transfer all our gas, oil, and mineral rights to you as the purchaser of Star Ranch. We are ready to sell Star Ranch of about 160 acres whenever you are ready to buy.

* * * * * *

"We understand that it is a cash sale of fourteen thousand dollars 'as is' at the time of sale. This includes all gas, oil, and mineral rights.

* * * * * *

/s/ "Miss Aida Berry "Miss Emilia Berry" "March 18, 1967 [3 days after the contract of sale]

"Wm. N. Price, State Highway Engineer "R. L. Towne, Chief Right of Way Agent "P. M. Anderson, Right of Way Agent "Arizona Highway Dept. "1739 West Jackson St. "Phoenix, Arizona 85007 "or

"To Whom It May Concern: * * *

"Since January 1967, through a law office, we entered into a transaction for the sale of Star Ranch, with a buyer who wants to repair and restore the Star Ranch house, and buildings, and make Star Ranch a cattle ranch and comfortable home. * *

* * * * * *

"It would be a great loss and damage to us to lose the sale to this particular buyer, because we want Star Ranch restored and repaired, and he is interested in the buildings, and is willing to restore Star Ranch. Star Ranch is one of the few historical landmarks in that area, and deserves special consideration, regarding the new proposed highway.

* * * * * *

/s/ "Aida Berry "Emilia Berry" "April 3, 1967 [19 days after the contract of sale]

"Dear Mr. Robotka,

"We wonder if you were sorry that you decided to buy Star Ranch. * *. *

"*We are afraid* that because you find it inconvenient to go back and forth from your business, *you might sell it to some one else. We want to be the ones to buy it back from you.*

"At any stage that you feel that you can not go ahead to repair it, we want to buy it from you and pay for the improvements that you make besides the amount which you paid to us.

"* * * Now to even sell it after letting it run down, grieves us, and it hurts our conscience.

"We are asking you for a very special request. We have been grieving very much because of selling Star Ranch and want to buy it from you back again. * * *

* * * * * *

"Perhaps our judgment became blurred with so many problems that we have tried to solve here. Because of our financial problems here, we resorted to the sacrifice selling of Star Ranch, as an easy way at the time, but which was not the right thing for us to do, * * *

"We would be willing to return to you, your full amount of money, and your attorney, escrow, title and other expenses plus five hundred dollars ($500.00) for the inconvenience you have had. * * *

* * * * * *

"We know that you did not intend to buy for speculation to sell to someone else. We would not like for anyone else to own it.

We are very anxious to have Star Ranch again before you start any expense on repairs. Before anyone gets it we want to save it from getting into the hands of other people, who might want to buy it.

\* \* \* \* \* \*

/s/ "Aida Berry
"Emilia Berry"

"April 12, 1967 [28 days after the contract of sale]

"Dear Mr. Robotka,

"\* \* \* We also find it very impractical for us to try to carry on the repairs from here, without going often and so have decided to sell Star Ranch to you.

\* \* \* \* \* \*

"We are selling it to you especially, because we know that you are not buying it to sell again, but plan to restore Star Ranch. If you ever want to sell it later, please let us know because we may want to buy it, \* \* \*

\* \* \* \* \* \*

. "We are sorry to have been so undecided about Star Ranch. Some relatives and friends advise us against selling it, and others are in favor of selling it, until a person does not know what to do.

"\* \* \* We are willing for you to go ahead with the purchase of Star Ranch, *because we trust that you will repair and restore Star Ranch into a nice country home, which has. always been our wish.*

\* \* \* \* \* \*

/s/ "Aida Berry
"Emilia Berry"

"April 26, 1967 [42 days after the contract of sale]

"Dear Mr. Robotka,

"We gave you the option to withdraw your offer to buy Star Ranch for whatever reason you might have, without any loss to you, even beyond the terms of the agreement. Likewise, we understood that you would give us the same option to withdraw, especially when we realized our mistake of parting with our old Family Home.

\* \* \* \* \* \* .

"\* \* \* We now feel that you should respect *our sentimental reason* for wanting to withdraw from the sale.

\* \* \* \* \* \*

"\* \* \* [W]e were rushed into signing the agreement without thinking or realizing that what we were signing was a mistake and would cause us a life time of remorse.

\* \* \* \* \* \*

/s/ "Aida Berry
"Emilia Berry"

"June 14, 1967 [91 days after the contract of sale]

"Dear Mr. Robert Robotka,

\* \* \* \* \* \*

"We would have released you from the sale transaction of Star Ranch at any time before or after the sale, at any stage and for any personal reason whatever. You promised and we trusted that you would do the same for us. Even though oral, you and we had a mutual agreement that even after the sale, that if either party realized that it had made a mistake in the selling, or was sorry that it had made a sale, that the sale would be dissolved, and cancelled. \* \* \*

\* \* \* \* \* \*

"We were rushed into the signing of the sale agreement by the highway dept., who put great pressure on us and gave us such a short notice, \* \* \*

\* \* \* \* \* \*

"If you will sell Star Ranch back to us again, we shall be glad to rent or. lease it to you for a long length of time, at a very small rental rate, until you found a large ranch with more acreage where you could really have a cattle business, Star Ranch is too small to be called a cattle ranch.

\* \* \* \* \* \*

"\* \* \* [I]t was not right for us to think of parting with it. .\* \* \* We are surprised at ourselves that we were led to make such a wrong and radical move. *After· we ·signed we reflected what we had done, and saw that it was a great mistake,* .

which in the rush and confusion we did not realize.

\* \* \* \* \* \*

"\* \* \* We want to clear our conscience for having parted with it and feel that we must regain it as soon as possible before you may think of selling it to anyone else, if you found that you too had made a mistake, and might be discouraged on account of the water problem and expense of repairs. *You promised that you would give us first choice if you decided to sell it. We are ready to buy it back again now in case that you found that you also may have dashed into the venture too soon and found it discouraging, difficult and expensive.*

\* \* \* \* \* \*

/s/ "Aida Berry
"Emilia Berry"

(Emphasis added in the respective letters as indicated)

In response to the motion for summary judgment, both plaintiffs filed an affidavit which detailed their versions of what occurred. Both of these affidavits state that the defendant promised in connection with this sale that "\* \* \* *when he* [the defendant] *could afford it,* he would reconvey this property back to these plaintiffs, for the same price he purchased it for, \* \* \*" (Emphasis added.) Though there are statements in these affidavits that would support many of the general allegations of the complaint, there is no denial of the authenticity of any of the letters which were attached to the motion for summary judgment; nor is there an explanation of any of these letters with the sole exception of the letter dated April 12, 1967. As to this letter, both sisters assert that it was written at the defendant's request as he wished to present it to the Highway Department so that the sisters would not "\* \* \* be sued by the Highway Department, not only for condemnation [*sic*] of the land, but also for damages for holding up the transaction \* \* \*"

All assertions in the affidavits that the defendant made threats of a suit for damages by the Highway Department are as to a telephone conversation occurring after April 11, 1967, which would be approximately three weeks after the agreement of sale had been executed. The affidavits are thus at odds with the complaint with respect to the chronology of this conversation. Nowhere in the affidavits of the plaintiffs is there any assertion of facts which would tend to indicate that the defendant can now "afford" to reconvey the property to the plaintiffs.

■ On motion for summary judgment, the initial burden to negative issues of fact is upon the moving party. Elerick v. Rocklin, 102 Ariz. 78, 81, 425 P.2d 103, 106 (1967); Flynn v. Lindenfield, 6 Ariz. App. 459, 461, 433 P.2d 639, 641 (1967). Once this has been done, it devolves upon the party resisting the motion to come forward with a showing that there is competent evidence so as to create a factual issue for the trier of fact; the resisting party cannot rely upon its pleadings to meet this burden. State ex rel. Herman v. Tucson Title Insurance Company, 101 Ariz. 415, 420 P.2d 286 (1966); State Automobile & Casualty Underwriters v. Engler, 90 Ariz. 321, 367 P.2d 665 (1961). In determining whether there is any issue of fact, the court should resolve any reasonable doubt in favor of the party resisting the motion. Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 368 P.2d 317 (1962).

■ Letters of an opposing party may be considered upon a motion for summary judgment in the absence of an objection of lack of authenticity. Wakeham v. Omega Construction Company, 96 Ariz. 336, 339, 395 P.2d 613, 614–615 (1964); and *see* Dehaan v. Brandeis University, 150 F.Supp. 626 (D.Mass.1957).

Considering those allegations and statements of plaintiffs which arguably charge fraud with particularity, *see* Rule 9(b), Rules of Civil Procedure, 16 A.R.S., plaintiffs in their affidavits, purport to charge defendant with the making of a false and fraudulent promise to reconvey, and a pre-

sumably false representation of the intentions of the Highway Department.

■ In this jurisdiction, a promise to do something in the future, made with a present intent not to perform, will give rise to an action in fraud. Law v. Sidney, 47 Ariz. 1, 5, 53 P.2d 64, 66 (1936). Such promissory fraud lies not in the subsequent failure to perform, but in the misrepresentation of present state of mind, *see* Prosser, Torts § 104, at 744–45 (3d ed. 1964), citing Lord Bowen's statement in Edgington v Fitzmaurice, 1882, L.R. 29 Ch.Div. 359, to the effect that "The state of a man's mind is as much a fact as the state of his digestion."

■■ This court has held that rescission, as opposed to damages, may be granted for "innocent" as well as fraudulent misrepresentations, and that, accordingly, proof of each of the nine elements of actionable fraud is not essential in a rescission suit. Horne v. Timbanard, 6 Ariz. App. 518, 520, 434 P.2d 520, 522 (1967); Miller v. Boeger, 1 Ariz.App. 554, 558, 405 P.2d 573, 577 (1965). However, insofar as innocent, good faith representations of future intentions are concerned, the parol evidence rule negates the effectiveness of any such promises which would ordinarily be incorporated into an integrated contract such as the one here. Stewart v. Southwest Cotton Co., 38 Ariz. 547, 2 P.2d 1041 (1931). A promise to reconvey does not come within that exception to the parol evidence rule recognized for collateral agreements that might "naturally" be made as a separate agreement. *See* Jamison v. Southern States Life Insurance Company, 3 Ariz.App. 131, 135, 412 P.2d 306, 310 (1966), and Restatement of Contracts § 240.

■ For the purposes of this opinion, we assume that promissory fraud is grounds for rescission, despite the integrated nature of the contract in this case. See Lusk Corporation v. Burgess, 85 Ariz. 90, 332 P. 2d 493 (1958); and Jamison v. Southern States Life Insurance Company, *supra*; and *compare* Caldwell v. Tilford, 90 Ariz.

202, 367 P.2d 239 (1961). *But see* Beers v. Atlas Assur. Co., 215 Wis. 165, 253 N.W. 584 (1934). It is, however, only fraud that will suffice as to this alleged promise to reconvey, and it is fundamental to any action invoking relief for fraud to show reliance upon the allegedly fraudulent misrepresentation. Cullison v. Pride O'Texas Citrus Association, 88 Ariz. 257, 355 P.2d 898 (1960); Sult v. Bolenbach, 84 Ariz. 351, 327 P.2d 1023 (1958).

Reliance exists in the mind of the relier, and, ordinarily a party's affidavit in simple, conclusory terms that he relied upon the misrepresentation alleged would be sufficient to withstand a motion for summary judgment. This case is extraordinary, however, in that the state of the plaintiffs' minds, graphically set forth in their own words and over their own signatures, has been made a part of the record. In this exceptional case, the defendant has been able to make a strong showing which clearly controverts plaintiffs' assertion of reliance.

None of the letters, either before or after the date of plaintiffs' execution of the earnest money agreement, is consistent with their claim that they relied upon the alleged promise of defendant that he would reconvey to them at some future date. To the contrary, they affirmatively show in clear, plain, intelligent and articulate English terms that plaintiffs decided to sell and sold the ranch to defendant: (1) because plaintiffs could not keep it in proper repair and defendant indicated he would go about restoring it to its previous condition; (2) because plaintiffs were in need of money; and (3) because plaintiffs were under pressure placed upon them by the Highway Department. Nothing is said in any of the letters about a promise to reconvey, as such, and the first allusion to any extra-contractual promise at all on the part of defendant appears in the letter of April 26, 1967, well over a month after plaintiffs executed the agreement, and after they had executed and forwarded a quitclaim deed to the property. Nothing in any letter suggests that a promise to re-

convey after conveyance was an inducement to plaintiffs to enter into the contract.

■ Reliance might, for fraud purposes, be defined as a belief which motivates an act. Though we closely approach the element of fraud labeled "right to rely," there is inherent in the concept of reliance itself the idea of a trust more profound than a mere wish or hope. Yet in plaintiffs' letter of April 3, 1967—over two weeks after they had entered into the earnest money agreement—there is little if anything to indicate even a *preexisting* wish or hope, let alone the acted-upon trust sufficient to rise to the level of reliance.

■ These letters negate the reliance that plaintiffs assert in their affidavit. They at least call for some minimal showing by the plaintiffs, by way of an explanation of the terms of the letters or an offer of some other facts, to be presented at trial on which a finding of reliance or material inducement could be predicated in spite of the content of the letters. Plaintiffs have made no such showing. They have offered an explanation only for the letter of April 12, 1967, stating that the language in it was selected to accommodate defendant. But if, in spite of that letter's essential consistency with the other letters presented by defendant, we grant it no consideration whatever, we must still deal with all of the remaining letters. Plaintiffs do not suggest that any of these were not intended to communicate what they plainly express on their face. The additional correspondence attached by plaintiffs to their opposition to defendant's motion has no tendency to counter the effect of these letters. They conclusively show that plaintiffs cannot establish the essential element of reliance on the alleged promise of defendant.

■ We also think that it is clear on the record that plaintiffs cannot establish a right to rely upon the alleged promise. At least where the claim is based upon fraud and the circumstances are inconsistent with innocent misrepresentation, the right to rely upon the alleged fraudulent statement or promise is prerequisite to rescission. See Godfrey v. Navratil, 3 Ariz.App. 47, 411 P.2d 470 (1966), and the discussion of that case and the right to rely in Horne v. Timbanard, *supra*, at 6 Ariz.App. 521, 434 P.2d 523. See also Cullison v. Pride O'Texas Citrus Association, *supra*.

In their complaint, plaintiffs allege a promise by defendant to reconvey the property to plaintiffs " * * * at any time they requested * * * " Plaintiffs' affidavits do not support this allegation. The gravamen of defendant's alleged promise, according to the affidavits, is that he would reconvey when he could "afford" a larger ranch. Such a promise is far too indefinite to warrant reliance in a land transaction. "To be fraudulent as having been made without intention to perform, a promise must be specific, definite." Blake v. Paramount Pictures, 22 F.Supp. 249, 252 (S.D. Calif.1938).

■ Nor does the alleged statement of defendant with regard to the intention of the Highway Department to bring suit against plaintiffs for damages for delaying construction of the new highway afford a possible ground for relief. There is no allegation that this particular statement was false, but, in any event, this alleged statement came too late. Whether fraudulent or innocent, the misrepresentation must have been relied upon as an inducement to enter into the contract. Plaintiffs, at the time of the telephone conversation in which the statement was allegedly made, had already entered into a binding contract to convey Star Ranch. There is no contention to the contrary. "Representations made after a transaction or contract cannot be made the basis of fraud for an attack upon such transaction or contract." 37 Am.Jur.2d Fraud and Deceit § 241, at 321. There can be no recovery in fraud for a deception by which a person is induced to do something which he is already bound to do. Plews v. Burrage, 19 F.2d 412, 414 (D. Mass. 1927); Beltner v. Carlson, 153 Neb. 797, 46 N.W.2d 153, 155 (1951).

Fraud is the great last resort in our civil law, and courts should be zealous in maintaining it as a viable basis for relief. But, in fraud, as in any other kind of case, justice will not be served by requiring a full-blown trial on allegations which the record shows cannot be supported.

Judgment affirmed.

HATHAWAY and KRUCKER, JJ., concur.