FLETCHER, Circuit Judge:
This is an appeal from an order of the district court affirming the bankruptcy court’s grant of summary judgment for the appellee Wallace Perry, the bankruptcy trustee of a bankrupt land development corporation, Cochise College Park, Inc. (Cochise).[1] The judgment relieves the trustee from liability for his actions in collecting and using payments under installment land contracts between Cochise and a nationwide class of land purchasers. We have jurisdiction under 11 U.S.C. § 47(a) (1976) (repealed 1978). We conclude that the bankruptcy court’s analysis of the complex transactions involved in this case may have led to improper conclusions about the ownership of the payments received on the land sale contracts and that it applied incorrect legal standards in evaluating the trustee’s alleged misconduct. We reverse and remand for further proceedings.
*1345 PACTS
In the late sixties, Cochise, an Arizona corporation, acquired an equity interest in several thousand acres of “barren desert land” in southwestern Arizona. DeMarco v. Security Planning Service, Inc., 462 F.Supp. 1066, 1069 (D.Ariz.1978). Naming the area Cochise College Park, Cochise platted subdivisions of the property but made only minimal improvements, failing to provide such necessaries as roads, streets, water, and electricity. Cochise then conducted a nationwide sales campaign to induce individuals to purchase lots in the various subdivisions. The sales were almost all on the installment basis with small downpayments and five-to-eight year terms to pay the balance in monthly payments. Id.
Before its bankruptcy in mid-1972, Cochise entered into thousands of land sale contracts, in each of which Cochise promised to transfer a warranty deed to a particular real estate lot and to construct certain improvements. In return, the purchaser promised to pay sums of money at times certain. Until final payment, Cochise held on to the deed or, where the deed had been delivered prior to final payment, took a mortgage on the lot. The operative documents for each sale included a land sale contract, a promissory note, a warranty deed, and in some cases a mortgage.
In some instances, Cochise sold and assigned the promissory notes and mortgages executed in connection with the land sale contracts to other persons. The assigneepurchasers of these promissory notes comprise the Hall class, which is not a party to this appeal.
In other cases, Cochise retained the notes and mortgages and collected payments on the notes, either directly or through an independent collection service, Computer Graphics, Inc. The land sale vendees whose promissory notes and mortgages were retained comprise the Baldrian class, the appellants.
Despite Cochise’s promises to the land sale vendees to improve the Cochise College Park to support the construction of livable residential dwellings, Cochise never provided any of the services or amenities common to residential property. 462 F.Supp. at 1069. By mid-1972, after five years of development and the sale of over 4,000 lots, no streets and none of the improvements necessary to support livable houses had been installed in Cochise College Park. Only 20 homes were built on the entire tract of land. Id. at 1071.
On June 5, 1972, a petition for involuntary bankruptcy was filed against Cochise. The next day, June 6, 1972, Cochise filed a voluntary petition for corporate reorganization under Chapter X of the Act. Soon after, Perry was appointed trustee and attempted to continue the operations of Cochise under Chapter X. On June 7, 1973, the reorganization proceedings were dismissed, and Cochise was adjudicated a bankrupt.
As trustee, Perry came into possession of the contractual documents respecting the land sale transactions between members of the Baldrian class and Cochise. Perry soon recognized the uncertainty and instability of the Cochise operations and reported to the court on September 1, 1972 that “his investigation ... revealed that there is unknown an extremely sizable obligation due to a large number of prospective purchasers of lots of the debtor who were sold with rights of rescission.” Nonetheless, from the date of his appointment until well after the adjudication of Cochise as a bankrupt on June 7, 1973, Perry repeatedly told members of the Baldrian class that they had to continue making payments on the promissory notes to protect their rights and threatened to foreclose on the mortgaged lots if payments were not made. Perry stated to at least some of the Baldrian class members that payments were being held in a separate “trust” account, were not -being disbursed to any third parties, and were being applied against the outstanding obligations of the vendees. He stated that he was “making every effort to have the company operate on a normal basis.” Members of the Baldrian class paid a total of at least $134,000 on the notes before and after the bankruptcy filing on June 5, 1972.
*1346 Initially, Perry apparently had some doubts about the ownership of funds received on the unassigned notes. On June 16, 1972, he obtained a restraining order enjoining Computer Graphics and others from disbursing any funds “until appropriate litigation can be instituted to determine the rights of the trustee in and to any promissory notes, and any funds collected in connection with said notes.” Nevertheless, on Octoher 24, 1972, without notice to the Baldrian class members, Perry requested and obtained an order requiring Computer Graphics to turn over to the estate all payments it had collected on the notes, less annual collection fees. Subsequently, in the liquidation proceeding, Perry obtained an ex parte order permitting him to pay administrative expenses with funds in his possession and proceeded to use the monies received on the notes to pay costs of administering the estate, including his own trustee’s fee.
On October 6, 1975, the Hall class filed a complaint against Perry, seeking a determination of “the propriety, right and authority” of Perry to “use, appropriate, or disburse funds in his custody or under his control that comprised ... payments by lot purchasers” on notes that had not been assigned to members of the Hall class.
The Baldrian class moved to intervene in the Hall class action. The bankruptcy court, agreeing with Baldrian that common issues of law and fact were presented, permitted intervention.[2] The Baldrian class alleged that Perry did not have title to payments made on the unassigned notes and also that he was personally liable for fraud, negligence, and conversion with respect to the collection of the note payments. The class sought return to it of all payments made on the promissory notes, together with interest.
Perry moved for summary judgment against the Baldrian class. The bankruptcy court granted summary judgment for Perry, holding that title to all of the funds was vested in the trustee and that the trustee was not liable to the Baldrian class on grounds of fraud,’ negligence, or conversion. The district court affirmed, and the Baldrian class now appeals.
STANDARD OF REVIEW
A grant of summary judgment is proper only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Bankr. Rule 756 (effective October 1,1973) (making Fed. R.Civ.P. 56 applicable in all bankruptcy adversary proceedings); In re Southland Supply Inc., 657 F.2d 1076, 1080 (9th Cir.1981). The evidence and inferences that may be drawn from it must be construed in the light most favorable to the party opposing summary judgment. Beckham v. Safeco Insurance Co. of America, 691 F.2d 898, 902 (9th Cir.1982).
ANALYSIS
The Baldrian class, in their first set of claims, allege that Perry is wrongfully withholding from members of the class payments made on promissory notes signed by them as part of their land sale contracts with Cochise. The bankruptcy court held that the appellants had raised no issue of material fact as to the ownership of the payments, since as a matter of law the trustee “had title to all funds received as paid-in on unassigned notes from whatever time, for all purposes.” The bankruptcy court’s grant of summary judgment for the trustee on this ground was plainly incorrect, since the court failed to recognize that dif *1347 ferent legal consequences might pertain if the contracts of the class members were executory, depending upon when the payments had been received. Since the answers to interrogatories and affidavits before the bankruptcy court appear to establish that at least some, if not all, of the contracts between Baldrian class members and Cochise were executory on June 5,1972, and that some if not all of the payments were received after June 5, 1972, the case must be remanded for further proceedings. The trial court must determine, as to each land sale contract, whether the contract was executory on June 5, 1972, see infra Part I, and, if so, when payments, if any, on that contract were received, see infra Part II.
The second set of claims allege affirmative misconduct by the trustee. Here, again, the bankruptcy court granted summary judgment for the trustee. The court held that the answers to interrogatories and affidavits before it raised no genuine issue of material fact concerning the personal liability of the trustee to the appellants for misconduct, because his acts either were not willful or were authorized by statute or by the court. This conclusion was unwarranted, since the answers to interrogatories and affidavits before the bankruptcy court raise genuine questions of material fact regarding the trustee’s compliance with his fiduciary duty to the Baldrian class and concerning the existence of actionable misrepresentations by the trustee. The case must be remanded for further proceedings. The bankruptcy court must determine (1) whether, as to each land sale contract, the contract was executory on June 5,1972, see infra Part I, and, if so, whether the trustee had in fact decided before August 6, 1973, to reject that contract, see infra Part III(A); and (2) whether, as to each land sale contract, the land purchaser made any payments on the contract in reliance on fraudulent or negligent misrepresentations by the trustee, see infra Part III(B).
I. Nature of the Land Sale Contracts.
The legal nature of the contractual relations between the members of the Baldrian class and Cochise on the date of the bankruptcy filing is of crucial importance in this case. If the contract between Cochise and a lot purchaser upon which payments were made was a fully executed contract on that date, then all payments on that note vested in the trustee. See infra Part 11(A). If the contract was executory, however, other consequences follow. See infra Part 11(B). Whether the land sale contracts were executed or executory also affects the liability of the trustee for misconduct. See infra Part III.
Without considering whether any of the land sale contracts were executory on June 5, 1972, the bankruptcy court entered summary judgment for defendant, even though the answers to interrogatories and facts sworn to in affidavits before the court tend to establish that some if not all of the contracts were executory. This being error, we reverse.
Seeking to sustain the grant of summary judgment, Perry argues that all of the contracts upon which payments were made were, as a matter of law, fully executed, not executory on June 5, 1972. We disagree.
Perry first contends that in each case the contract upon which payments were made comprised only the promissory note signed by the Baldrian class member, pursuant to which the class member promised to pay specified sums at times certain. Perry argues that any obligations of Cochise to convey a deed to the lot or to construct roads for and to provide utility connections to the purchased lot were commitments by Cochise that were not part of that promissory note “contract.” We reject that argument.
A “promissory note” is itself merely a “promise or engagement, in writing, to pay a specified sum at a time therein limited ... to a person therein named, or to his order, or bearer.” Black’s Law Dictionary 1093 (rev. 5th ed. 1979). A “contract,” by contrast, is an agreement between two persons “which creates an obligation to do or not to do a particular thing” and comprises promises by both parties to perform *1348 certain obligations. Id. at 291-92; see Shattuck v. Precision-Toyota, Inc., 115 Ariz. 586, 588-89, 566 P.2d 1332, 1334-35 (1977) (valid contract requires mutual irrevocable promises by both parties). A promissory note, standing alone, is not a contract at all, because, simply put, it embodies only one of the mutual promises necessary to create a contract. It evidences only one side of the bargain.
The existence of a promissory note on any given date, therefore, is not in and of itself proof that the payments on the note are in performance of an executed contract. Since payments on a promissory note are merely the performance of one side of the bargain, the note must be examined in conjunction with the other undertakings that, together with the promissory note, constitute the relevant contract of which the promissory note is but a part to determine what commitments remain to be performed by the parties. See, e.g., Smith v. Latourrette-Fical Co., 37 Ariz. 265, 270, 293 P. 973, 976 (1930) (contract to sell farm unit in subdivision determined to include not only note and mortgage but also covenant to furnish water to subdivision). Each land sale contract did not, and by definition could not, consist solely of the promissory note.[3]
Perry also argues that even if the contracts here between the members of the Baldrian class and Cochise encompassed both the promissory notes and various obligations of Cochise, in any event, the contracts with the purchasers were not “executory” contracts under the terms of the Act. We reject that argument.
An “executory” contract under the Act is one:
under which the obligations of both the bankrupt and the other party to the contract are so far unperformed [at the moment of filing] that the failure of either to complete performance would constitute a material breach excusing the performance of the other.
In re Select-A-Seat Corp., 625 F.2d 290, 292 (9th Cir.1980) (per curiam) (quoting from Jenson v. Continental Financial Corp., 591 F.2d 477, 481 (8th Cir.1979).[4]
Under this standard, the answers to interrogatories and affidavits raise a material issue of fact as to whether some if not all of the contracts between Cochise and the purchasers constituted executory contracts upon June 5, 1972, the date of the filing. The record shows that some if not all of the land sale contracts encompassed both obligations of the purchaser to make various payments at times certain and obligations of Cochise to deliver the deed to the lot to the purchaser, to release the mortgage, if any, on that lot upon completion of payments on the promissory note, and to construct various improvements. Under these circumstances, the failure of Cochise to develop the land as promised or to convey a warranty deed to the purchaser could each constitute a material breach excusing performance by the land purchaser of his re *1349 maining obligations.[5] Likewise, the failure of any given land purchaser to make payments on his promissory note could constitute a material breach ¡excusing Cochise from completing its performances under the land sale contract.[6] Thus, in all likelihood, some if not all of the land sale contracts here were executory on June 5, 1972.[7]
The mere fact that the promissory notes presented to Cochise under the land sale contracts could be assigned to third parties does not change this conclusion. Although a real estate lessee typically is free to assign his leasehold interest to a third party, the ability of a lessee to assign the leasehold interest (i.e., the right to receive the use of certain real estate for a time certain) has never been thought to transform an unexpired real estate lease, a typical example of an executory contract, from an executory into an executed contract. See, e.g., Palmer v. Palmer, 104 F.2d 161, 162-63 (2d Cir.), cert. denied, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); 4A J. Moore & L. King, Collier on Bankruptcy ¶ 70.44[1], at 539 (14th ed. 1978).
Since some if not all of the land sale contracts were probably executory on June 5, 1972, it is probable that the ownership of the payments received by the trustee as well as the trustee’s conduct must be evalu *1350 ated under the principles governing executory — -as opposed to executed — contracts. Since under bankruptcy law, transactions involving executory contracts give rise to different legal consequences from those involving executed contracts, granting summary judgment on those issues without deciding whether the contracts were or were not executory was improper.
II. Ownership of Payments.
Appellants challenge the bankruptcy court’s conclusion that title to all payments on the promissory notes signed as part of land sale contracts vested in the trustee. They contend that since title to executory contracts does not vest in the trustee until the trustee affirms those contracts and since the trustee here never affirmed any of the contracts, the trustee does not have title to the payments received pursuant to those contracts. Perry contends that since Cochise had title to the promissory notes, Perry was vested with title to the notes on June 5,1972, the date of filing of the original petition in bankruptcy, and, ipso facto, has title to any funds generated on those notes.
The bankruptcy court’s determination that ownership of the funds received on the contracts flowed from the trustee’s purported taking of title to the promissory notes was incorrect. Rather, the ownership of payments depends on (a) whether the land sale contract on which the payments were made was executory on June 5, 1972; and (b), if so, when the payments were in fact received. Since the bankruptcy court made no distinction between executory and executed contracts, the case must be remanded for further proceedings. To guide the determinations on remand, we outline how payments made by the Baldrian class members must be treated, depending on the facts.[8]
A. Payments on Contracts That Were Non-Executory on June 5, 1972.
The trustee properly took title on behalf of the estate to all payments received on any land sale contract that was fully executed on June 5, 1972, regardless of whether payments were made before or after June 5, 1972.
Sections 70a(5), 186 of the Act provide that a reorganization or bankruptcy trustee is vested by operation of law as of the date of filing with title to all “property . .. which prior to the filing of the petition [the bankrupt] could by any means have transferred, or which might have been levied upon and sold under judicial process against him, or otherwise seized, impounded, or sequestered.” 11 U.S.C. §§ 110(a)(5), 586 (1976). Such property includes cash and the like possessed by the bankrupt on the date of filing, whether held by the bankrupt himself, e.g., In re Tudor, 100 F. 796, 797 (D.Colo.1900) (money), or by an agent on the bankrupt’s behalf, e.g., In re Tele-Tone Radio Corp., 133 F.Supp. 739, 744 (D.N.J.1955) (bank account). On June 5, 1972, the trustee was vested with title to all cash held by Cochise or by Computer Graphics on Cochise’s behalf.
Property passing to the trustee under section 70a(5) also includes executed contracts between the bankrupt and third parties and any proceeds or right to proceeds still due. E.g, Hudson v. Wylie, 242 F.2d 435, 447 (9th Cir.1957) (contract right to collect money based on performance of services by bankrupt that were completed before filing); In re Hannan, 127 F.2d 894, 897 (7th Cir.1942) (contract right to receive commissions for services of bankrupt rendered prior to filing); In re Duncan, 148 F. 464, 469 (D.S.C.1906) (promissory note of *1351 bankrupt’s employer based on services of bankrupt rendered prior to filing). On June 5, 1972, the trustee was vested with both executed land sale contracts, if any, and the right to further payments, if any.[9]
B. Payments on Contracts That Were Executory on June 5, 1972.
Payments received by Cochise, Perry, or Computer Graphics on land sale contracts that were executory at the time of filing did not necessarily vest in the trustee as property of the estate. The ownership and treatment of each of those payments, and claims arising therefrom, vary according to the date upon which the particular payment was received.
1. Payments Received Before June 5, 1972.
Payments received by Cochise or by Computer Graphics before June 5, 1972 on land sale contracts that were executory on June 5, 1972 were property of the bankrupt. Title to those payments vested in the trustee as of the date of filing of the original petition.[10] Act §§ 70a(5), 186 (1976). Compare In re Superior Motor Truck Co., 275 F. 623, 624 (N.D.Ga.1921) (payments to seller received by seller prior to filing held by bankrupt seller as his property not “on any sort of trust, or as the property of the buyer,” even though trucks not delivered prior to filing) with Gulf Petroleum, S.A. v. Collazo, 316 F.2d 257, 261 (1st Cir.1963) (pre-filing payments to seller of land to be held in escrow by bankrupt seller until closing of sale must be returned to buyer, where trustee rejects executory land sale contract before closing).
While Perry has title to all prefiling payments, appellants, of course, have claims against the estate arising from payments made prior to filing.[11] Since those *1352 payments are property of the estate, Perry had no duty to notify the payors before using those funds to pay administrative expenses or other claims against the estate.
2. Payments Received On or After June 5, 1972 and Before August 6, 1973.
Payments received on executory contracts on or after the date of filing but prior to August 6, 1973 became property of the estate yet give rise to administrative expense claims against the estate in the amount of those payments.
An executory contract of the bankrupt vests in the trustee, if at all, only if the trustee affirms the contract. Palmer v. Palmer, 104 F.2d 161, 163 (2d Cir.), cert. denied, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); 4A J. Moore & L. King, Collier on Bankruptcy 170.43[2], at 524-25 (14th ed. 1978). Until rejection, however, the ex-ecutory contract continues in effect and the non-bankrupt party to the executory contract is not a creditor with a provable claim against the bankrupt estate. See Mohonk Realty Corp. v. Wise Shoe Stores, Inc., Ill F.2d 287, 290 (2d Cir.), cert. denied, 311 U.S. 654, 61 S.Ct. 47, 85 L.Ed. 418 (1940).
Where a bankrupt is in reorganization under Chapter X, the trustee need not affirm or reject an executory contract until a reorganization plan is submitted. 6 J. Moore & L. King, Collier on Bankruptcy ¶ 3.23[6], at 580 (14th ed. 1978); see In re American National Trust, 426 F.2d 1059, 1064 (7th Cir.1970); Mohonk Realty, 111 F.2d at 290. If the trustee fails to adopt the executory contract in the reorganization plan, the contract is deemed rejected, as of the date a petition was originally filed under the Act. See In re Gravure Paper & Board Corp., 234 F.2d 928, 930-31 (3d Cir. 1956).
Where the bankrupt estate is in liquidation, the trustee to affirm an executory contract must do so by the later of the date 30 days after the trustee’s appointment and the date 60 days after the adjudication of bankruptcy. Bankruptcy Act § 70b, 11 U.S.C. § 110(b) (1976). If the trustee fails to affirm the contract during that period, it is deemed rejected as of the date of the original filing of a petition under the Act. Bankruptcy Act § 63c, 11 U.S.C. § 103(c) (1976); Gravure Paper & Board, 234 F.2d at 931.
The rejection of an executory contract, whether by law or by affirmative act of the trustee, constitutes “a breach of such contract ... as of the date of the filing of the petition initiating a proceeding under this title.” Bankruptcy Act § 63c, 11 U.S.C. § 103(c) (1976).[12] The anticipatory breach gives rise to a claim provable against the bankrupt estate for damages arising from the breach. Bankruptcy Act § 63a(9), 11 *1353 U.S.C. § 103(a)(9) (1976).[13] The claim for damages is treated on a parity with other similar claims. In re Maryvale Community Hospital, Inc., 456 F.2d 414, 418 (9th Cir.), cert. denied, 409 U.S. 879, 93 S.Ct. 133, 34 L.Ed.2d 133 (1972); see Matter of Greenpoint Metallic Bed Co., 113 F.2d 881, 884 (2d Cir.1940) (arrangement proceeding).
Where the trustee does not submit a plan of reorganization and does not explicitly affirm the contract either during Uhe period of reorganization or within the 60 days after the termination of reorganization, a contract that is executory on the -date of the original filing under the Act is deemed rejected by operation of law on the later of the date 30 days after the appointment of the trustee and the date 60 days after the date of the adjudication of bankruptcy that terminates the reorganization period. Thus, in this case, all of the land sale contracts that were executory on June 5,1972 were rejected by operation of law on August 6, 1973, effective June 5, 1972, and hence were breached by Cochise as of June 5, 1972.[14] The lot purchasers whose contracts were executory on June 5, 1972 were therefore not obligated to make payments on the notes after June 5, 1972, the date of the breach of those contracts.[15] Nevertheless, some of the purchasers here did continue to make payments on the executory contracts after the date of the breach of the underlying contract but before the date upon which the rejection took place.
Payments on a rejected executory contract made after the rejection takes place are not property of the estate. See infra Part 11(B)(3). Since title to such contracts does not vest in the trustee, the trustee has no right to enforce them. The Bankruptcy Act does not address, however, the status of payments that are made to the trustee after the effective date of rejection but before rejection has occurred by action of the trustee or by operation of law.
Appellants contend that payments made on an executory contract in the period between the June 5, 1972 filing and the August 6, 1973 rejection should be treated not as property of the estate but as property held by the trustee in a constructive trust for the purchasers pending rejection. Under this approach, where the executory contract is affirmed, the payments at the moment of affirmance become property of the estate. On the other hand, where the executory contract is ultimately rejected, the interim payments are returned dollar-for-dollar to the purchasers. Under this theory, the use of such payments to pay the administrative expenses of the estate would be improper since the payments never become property of the estate.
*1354 Perry argues in response that payments made in the interim between the original filing and rejection or affirmance should be treated the same as payments on executed contracts. Under Perry’s theory, the lot purchasers are as to these payments mere general creditors of the bankrupt estate.
We reject both positions. In light of the policies underlying the treatment of executory contracts under the Act, we conclude that payments received by the trustee on an executory contract during the period between the date of filing and the date of rejection do become property of the estate. However, these payments give rise to claims against the estate of an administrative expense priority in the amount of the reasonable value of the consideration tendered to the trustee. In reaching this conclusion, we find support both in previous case law and in the policies underlying the Act.
This treatment of executory contracts is supported by the well-settled principles governing treatment of creditors of a bankrupt who confer benefit on the bankrupt estate after the date of filing of a bankruptcy petition. Where the consideration supporting the claimant’s right to payment is both supplied to and beneficial to the trustee in the operation of the bankrupt’s post-filing business, the consideration becomes property of the estate but the right to payment is accorded first priority under section 64a(l) of the Bankruptcy Act.[16] See 4A J. Moore & L. King, Collier on Bankruptey 170.43, at 524 (14th ed. 1978); cf. In re Health Maintenance Foundation, 680 F.2d 619, 621 (9th Cir.1982) (denying priority to severance pay claims based on consideration that was neither supplied to nor beneficial to trustee, since services of claimant had been provided to bankrupt prior to bankruptcy); 120 Wall Associates v. Schilling, 266 F.2d 548, 550 (2d Cir.1959) (denying claim for rent where trustee made no use of leasehold).
This rule is commonly applied in the situation arising when the trustee of a bankrupt lessee continues in possession of the leasehold during the period between the effective date of rejection and the date of the actual act of rejection of the lease. See generally Palmer, 104 F.2d at 162-63 (2d Cir.), cert. denied, 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939); 6 J. Moore & L. King, Collier on Bankruptcy U 3.23[6.1], at 590-93 (14th ed. 1978). During the period between initial filing under the Act and the rejection of the lease, the trustee is not required to pay or to set aside in trust the rent due under the lease nor to refrain from using the leasehold for the benefit of the estate. See Palmer, 104 F.2d at 163; 4A J. Moore & L. King, Collier on Bankruptcy f 70.44[4], at 550-52 (14th ed. 1978). The lessor obtains, however, a claim with administrative expense priority in the amount of the reasonable value of the leasehold used during the interim period by the trustee for the benefit of the estate.[17] S. & W. Holding Co. v. *1355 Kuriansky, 317 F.2d 666, 667-68 (2d Cir. 1963); see In re First Research Corp., 457 F.2d 331, 332 (5th Cir.1972). This special administrative expense priority maintains parity among all of the creditors of an estate who confer benefits on the estate after the date of filing. If a lessor, or for that matter any individual, who confers economic benefit on a bankrupt estate, were not given such a priority, it is likely he would refuse to confer such benefits and would thereby jeopardize the orderly reorganization or administration of the estate.
Moreover, the Act gives the trustee the power to affirm or reject executory contracts on the theory that the value of the consideration still owed to the estate under some executory contracts exceeds the cost of the remaining obligations owed under the contract to the other party. The theory is that advantageous contracts should be affirmed by the trustee as a means of enhancing the likelihood of successful reorganization, or, if the estate is in liquidation, as a means of increasing creditor dividends.[18] The Act provides that any claim arising from the trustee’s post-filing obligations under the contract has an administrative expense priority where the trustee ultimately affirms,[19] yet does not specify how payments made to the estate during the period while the trustee is deciding whether to affirm or to reject are to be treated if the trustee subsequently decides to reject.
We think the claim for return of such payments must receive a like priority. If payments made after the initial filing but before rejection were not given an administrative priority, a party who owes the bankrupt payments under an executory contract would face the risk that his claim for post-petition payments would be treated as a mere unsecured claim if the executory contract were rejected. A party placed in that situation would often be well-advised to cease making payments, even though he could be sued for breach of contract,[20] because he might well recover little or nothing as an unsecured claimant if the trustee rejects. Providing an administrative expense priority for post-filing payments in the event of rejection encourages parties to continue performance of their executory contracts with the debtor during the interim period and thus furthers the statutory policy of encouraging the continued performance of executory contracts which may be beneficial to the estate until the trustee makes his decision.[21]
*1356 In this case, the trustee was entitled to use post-filing payments in the administration of the estate. The lot purchasers have claims provable against the estate of administrative expense priority on parity with any other administrative expense claims against the estate.[22]
3. Ownership of Payments Received After August 6, 1973.
Payments made on an executory contract after rejection are not property of the bankrupt estate. The underlying contracts having been rejected and thus breached, these payments remain the property of the payors.[23] See In re Gravure Paper & Board Corp., 234 F.2d 928, 930, 932 (3d Cir.1956) (once trustee rejects lease, he no longer has any “right, title or interest” in lease or its proceeds); Green v. Finnigan Realty Co., 70 F.2d 465, 466-67 (5th Cir. 1934) (once trustee rejects lease, trustee is trespasser and has no right to use or occupancy).
Where the trustee takes or retains possession of property that is not an asset of the estate, he is personally liable for damages arising from this illegal act, unless he acts both in good faith and with reasonable grounds for believing that his possession is proper. See Leonard v. Vrooman, 383 F.2d 556, 560-61 (9th Cir.1967) (trustee is personally liable for damages arising from his wrongful possession of “property which is not asset of the estate”); Green, 70 F.2d at 466-67 (trustee who occupies leasehold beyond date of rejection of lease is trespasser and is liable to lessor for reasonable worth of consideration conveyed to trustee after that date); cf. Gravure Paper, 234 F.2d at 930, 932 (trustee responsible for return of deposit on trustee’s purported sale of lease, since lease had been rejected prior to purported sale and thus trustee had “offered for sale and ‘sold’ a lease to which he had no ‘right, title or interest’ ”).
Any payments on executory contracts received by Perry after August 6, 1973, the date upon which rejection of all of the executory contracts took place, never became property of the estate. The trustee was therefore obligated either to return these monies immediately to the payors, or, at a minimum, to set the monies aside in trust for them. Charged with knowledge of the principles of bankruptcy law, the trustee could not reasonably have believed that he was entitled to use the payments in the administration of the estate.[24] To the *1357 extent they have not been returned to the purchasers, these are monies (together with appropriate interest) for which the trustee is personally responsible.[25]
III. Misconduct of the Trustee.
Appellants contend that to the extent that their recovery against the estate does not satisfy all of their claims against the estate, Perry should be held personally liable for such payments because he failed affirmatively to reject those contracts that were executory and induced all purchasers to continue making payments on the notes by misrepresentations. They argue that the trustee owed a fiduciary duty to the purchasers whose contracts were executory on June 5,1972, requiring him to reject the contracts immediately upon his appointment as Chapter X trustee, since he should have realized that a successful reorganization of Cochise was impossible. They assert that the trustee’s breach of this duty gives rise to his personal liability for any payments made after the date of filing. In addition, they argue that the trustee is personally liable for any payments made in reliance on the trustee’s intentional or negligent misrepresentations.
The bankruptcy judge and the district court summarily rejected these contentions. We conclude that the bankruptcy judge and district court erred in granting summary judgment on appellants’ claims because they evaluated Perry’s conduct under incorrect legal standards.
A. Liability for Failure to Reject Executory Contracts.
A bankruptcy or reorganization trustee is a fiduciary of each creditor of the estate, including anyone who is a party to an executory contract with the bankrupt. See Wolf v. Weinstein, 372 U.S. 633, 650, 83 S.Ct. 969, 979, 10 L.Ed.2d 33 (1963); Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 461 (6th Cir.1982); Sherr v. Winkler, 552 F.2d 1367, 1374 (10th Cir.1977); Moulded Products, Inc. v. Barry, 474 F.2d 220, 224 (8th Cir.), cert. denied, 412 U.S. 940, 93 S.Ct. 2779, 37 L.Ed.2d 400 (1973). As such, he has a duty to treat all creditors fairly and to exercise that measure of care and diligence that an ordinarily prudent person under similar circumstances would exercise. Weaver, 680 F.2d at 461; Sherr, 552 F.2d 1374; In re Johnson, 518 F.2d 246, 251 (10th Cir.), cert. denied, 423 U.S. 893, 96 S.Ct. 191, 46 L.Ed.2d 125 (1975). Although a trustee is not liable in any manner for mistakes in judgment where discretion is allowed, Mosser v. Darrow, 341 U.S. 267, 273-74, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951); Weaver, 680 F.2d at 461; Sherr, 552 F.2d at 1375, he is subject to personal liability for not only intentional but also negligent violations of duties imposed upon him by law, see Mosser, 341 U.S. at 272, 274, 71 S.Ct. at 682, 683; Johnson, 518 F.2d 246, 251; cf. Leonard v. Vrooman, 383 F.2d 556, 561 (9th Cir.1967) (trustee is personally liable for acts which either are not taken in good faith or are unreasonable).[26]
*1358 While a debtor is in reorganization and for the first 60 days of a bankruptcy proceeding, the decision whether to affirm or reject an executory contract is within the discretion of the trustee.[27] See Mohonk Realty Corp. v. Wise Shoe Stores Inc., 111 F.2d 287, 290 (2d Cir.), cert. denied, 311 U.S. 654, 61 S.Ct. 47, 85 L.Ed. 418 (1940); Bankruptcy Act § 70b, 11 U.S.C. § 110(b) (1976). Thus, as long as the trustee remains undecided on whether to affirm or to reject an executory contract and the decision remains in his discretion, the trustee has no duty to creditors to tell them that he is entitled by law to reject that contract. Once the trustee has finally decided to reject an executory contract and therefore not to perform his obligations under that contract, the trustee then comes under a duty to take formal steps to reject it. To fail to do so and thereby permit the creditor to continue to perform after the date of decision to reject directly and unnecessarily injures the creditor[28] and is not consonant with conduct of an ordinarily prudent person serving in the capacity of trustee. Such failure therefore gives rise to a claim for damages for which the trustee is personally liable.
The papers before the bankruptcy court do not disclose whether the trustee had or had not decided before August 6, 1973 to reject some if not all of the land sale contracts that were executory on June 5, 1972. Nevertheless, the bankruptcy court entered summary judgment for the trustee on appellant’s claim of misconduct by the trustee on the ground that the trustee’s conduct was authorized by federal statute. This was error.
If the trustee is found to have decided before August 6, 1973 to reject the executory land sale contracts, the trustee is personally liable to the Baldrian class for damages arising out of this violation of his fiduciary duty. Damages would consist of all payments made post-filing, after the trustee’s decision to reject, less any amount received from the estate.[29]
B. Liability for Misrepresentations.
Appellants claim that the trustee is personally liable for damages arising from fraudulent and negligent misrepresenta *1359 tions communicated to Baldrian class members regarding the use and status of payments made on the land sale contracts. The bankruptcy court concluded that the trustee bore no personal liability to the Baldrian class members since the statements were “authorized and ordered by the court,” were “demanded of the trustee by congressionally authored statute and controlling case precedent,” or were not made “wilfully and deliberately.” We disagree.
The Act shields the trustee from liability for a “communication” to a creditor of the bankrupt concerning “the property of the bankrupt” where the communication is uttered “in good faith and with reasonable grounds for belief in its truth.” Bankruptcy Act § 21i, 11 U.S.G. § 44(i) (1976) (emphasis added). Where these conditions do not obtain, however, the trustee is liable to the same extent as any other person for damages arising from misrepresentations actionable under the law of the state in which he acts. See Leonard v. Vrooman, 383 F.2d 556, 561 (9th Cir.1967). Thus, where a statement made by the trustee to a land purchaser is otherwise actionable under state law, the trustee is personally liable, despite section 21i of the Act, if the statement was uttered either in bad faith or without reasonable grounds for belief in its truth.
Under Arizona law a person is liable in an action in fraud for damages arising from an intentional misrepresentation where all of the following elements exist: “(1) a representation;[30] (2) its falsity; (3) the materiality of representation; (4) the speaker’s knowledge of its falsity or ignorance of its truth;[31] (5) his intent that it be acted upon and in a manner reasonably contemplated; (6) the hearer’s ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon, and (9) his consequent and proximate injury.” Carrel v. Lux, 101 Ariz. 430, 434, 420 P.2d 564, 568 (1966) (footnotes added); Fridenmaker v. Valley National Bank of Arizona, 23 Ariz. App. 565, 568-69, 534 P.2d 1064, 1068 (1975).
Under Arizona law, liability may also arise if a person, in privity with another, makes a false communication without reasonable grounds for belief in its truth where the representation induces a justifiable reliance by the latter, even if the intent and knowledge required for an action in fraud do not obtain. See Van Buren v. Pima Community College District Board, 113 Ariz. 85, 87, 546 P.2d 821, 823 (1976); Arizona Title Insurance & Trust Co. v. O’Malley Lumber Co., 14 Ariz.App. 486, 491-93, 484 P.2d 639, 644-46 (1971). In light of the trustee’s fiduciary status vis-avis the purchasers, we have no difficulty concluding that under Arizona law the trustee was in sufficient privity with the purchasers to justify their reliance on statements or intentionally false promises he made in the course of his administration of the estate. Cf. id. at 491-92, 484 P.2d at 644 — 45 (title insurer’s function as disbursing agent for building contractors held to create requisite privity).
In granting summary judgment for the defendant, the bankruptcy court made no findings that the alleged misrepresentations had been made both in good faith and with reasonable grounds for belief in their truth. Nor did it find that the papers before it conclusively demonstrated a lack of liability under Arizona law for the allegedly fraudulent and negligent misrepresentations.
Rather, the bankruptcy court concluded that orders of the court, legal principles, or an absence of willful and deliberate conduct by the trustee required a grant of summary judgment for defendant. We disagree.
*1360 The récord is devoid of any indication that any of the trustee’s statements were “authorized and ordered by the Court.”[32] Nor should they have been, since no “eongressionally authorized statute or controlling case precedent” of which we are aware affirmatively “demandfs]” a trustee to increase the size of an estate through fraudulent or negligent misrepresentations. Furthermore, our review of the answers to interrogatories and affidavits before the bankruptcy court convinces us that genuine issues of material fact remain concerning the trustee’s liability under Arizona law for the allegedly fraudulent and negligent misrepresentations.[33] These issues could not properly have been determined on summary judgment.[34]
CONCLUSION
The bankruptcy court must conduct fact-finding hearings to determine the factual matters that are predicate to a proper determination of the legal issues presented. The legal issues must be decided consistent with the principles set forth in this opinion.
*1361 The summary judgment is reversed. The case is remanded.

. This case is governed by and all citations are to the Bankruptcy Act of 1898 (the “Bankruptcy Act”), ch. 541, 30 Stat. 544 (codified as amended at 11 U.S.C. §§ 1-1103 (1976)). While the Act was repealed by the Bankruptcy Reform Act of 1978, Pub.L. No. 95-598, 92 Stat. 2549, codified at 11 U.S.C. §§ 101-1330 (Supp. V 1981), the Act remains applicable to cases in which the original petition was filed prior to October 1, 1979, see Pub.L. No. 95-598, title IV, § 402(a), 92 Stat. 2682 (1978).

. Perry’s contention on appeal that the bankruptcy court improperly allowed the Baldrian class to intervene because the class raised issues outside the scope of the original complaint is meritless. The complaint filed by the Hall class sought to determine not only the “propriety, right and authority” of the trustee “to use, appropriate or disburse funds in his custody or under his control that comprised receipts from payments by lot purchasers” but also the liability of the trustee for “improper or unauthorized disbursements or appropriations of funds.” Since the claims of the Baldrian class clearly fall within the scope of the originally requested relief, the bankruptcy court did not abuse its discretion in allowing the Baldrian class to intervene for the relief it requested. See Bankr. Rule 724; Fed.R.Civ.P. 24(b).

. In his brief, Perry concedes as much when he asserts that he received and held any payments on the notes “with the expectation that COCHISE would seek to reorganize and to perform its reciprocal contractual commitments” (emphasis added).

. Although whether a given contract is “executory” under the Bankruptcy Act is an issue of federal law to be resolved under the Select-a-Seat test, see In re Alexander, 670 F.2d 885, 888 (9th Cir.1982), the question of the legal consequences of one party’s failure to perform its remaining obligations under a contract is an issue of state contract law. While the principles of contract law do not differ greatly from one jurisdiction to another, to the extent that they do, a bankruptcy court should determine whether one of the parties’ failure to perform its remaining obligations would give rise to a “material breach” excusing performance by other party under the contract law applicable to the contract under the choice of law rules of the state in which the court sits. See, e.g., In re Philadelphia Penn Worsted Co., 278 F.2d 661, 663 (3d Cir.1960); In re Italian Cook Oil Corp., 190 F.2d 994, 997 (3d Cir.1951). Under Arizona choice of law rules, questions of contract law regarding the sale of land located in Arizona are governed by Arizona law. See, e.g., Catchpole v. Narramore, 102 Ariz. 248, 251, 428 P.2d 105, 107-08 (1967); Smith v. Latourrette-Fical Co., 37 Ariz. 265, 271, 293 P. 973, 977 (1930).

. Perry contends that even if the contracts here between the members of the Baldrian class and Cochise encompassed more than the promissory notes, the only promise by Cochise included in the contract was a promise to convey a deed to the purchasers. He argues, in effect, that as to any purchaser who in fact had received a deed prior to June 5, 1972, the land sale contract was executed on that date, since Cochise’s only remaining obligation was to complete the purely “ministerial” act of releasing the mortgage on the purchased land upon completion of payments. We disagree.
While the extent of contractual promises is a factual issue to be determined at trial, the papers before us, including Cochise’s land sale registration form, as well as Perry’s own concession that on June 5, 1972, Cochise had substantial remaining contractual commitments to the purchasers, see supra note 3, make this contention seem disingenuous.
Moreover, even if each land sale contract did not include any promises by Cochise other than one to convey a deed and to release the mortgage (which seems unlikely), Cochise’s failure to deliver a warranty deed as promised (where such a deed had not been conveyed), to convey clear title (if required by the agreement), or to release the mortgage upon completion of payments could constitute material breaches of Cochise’s obligations.

. We find it inconceivable that, under the terms of these land sale contracts and Arizona law, the mere execution of a promissory note, without more, constituted sufficient performance of the purchaser’s obligations under the land sale contract so that default on note payments would not constitute a material breach excusing Cochise from further performance of its obligations (including delivery of deed, release of mortgage, or construction of improvements). See Earven v. Smith, 127 Ariz. 354, 356-57, 621 P.2d 41, 43-44 (Ariz.App. 1980) (default on “promissory note given as part of a land sales agreement” constitutes not “trivial” but “substantial” breach of underlying land sale contract).

. See In re Alexander, 670 F.2d 885, 886, 888 (9th Cir. 1982) (land sale contract is executory where buyer had to pay remainder of purchase price and seller had to give up possession and to convey title); Select-A-Seat, 625 F.2d at 292 (license agreement is executory where licensor had continuing duty not to sell to others and licensee had duty to make annual payments); In re Knutson, 563 F.2d 916, 917 (8th Cir.1977) (agreement for provision of airline services is executory, where airline’s provision of transportation services and bankrupt’s payment of price both had to be performed after date of filing); Gulf Petroleum, S.A. v. Collazo, 316 F.2d 257, 260 (1st Cir. 1963) (contract of purchase and sale is executory where deed not conveyed by seller and payments not completed by buyer at time of filing); In re Philadelphia Penn Worsted Co., 278 F.2d 661, 662, 664 (3d Cir.1960) (contract for sale of land is executory where deed and possession not conveyed by seller and all of purchase price not paid by date of filing); Workman v. Harrison, 282 F.2d 693, 699 (10th Cir.1960) (investment contract is executory where promoter’s provision of services and financier’s investment of money were not “completely performed” and remained “complex” at date of filing); In re New York Investors Mut. Group, Inc., 143 F.Supp. 51, 52, 54-55 (S.D.N.Y.1956) (contract to sell land is executory, where only $15,000 of $105,000 purchase price had been paid); cf. H.R.Rep. No. 595, 95th Cong., 1st Sess. 347 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 6303-04 (report on Bankruptcy Reform Act of 1978) (contract involving promissory note is executory until only remaining obligation is payment of note); S.Rep. No. 989, 95th Cong., 2nd Sess. 58 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5844 (same).

. The amended complaint in intervention of the Baldrian class does not allege facts giving rise to a claim of fraud on the part of Cochise in entering the land sale contracts nor assert a right to rescind the land sale contracts on grounds of fraud of the bankrupt. Thus, we do not address here the question whether, under the authority of In re Paragon Securities Co., 589 F.2d 1240, 1242 (3d Cir.1978) and Nicklaus v. Bank of Russellville, 336 F.2d 144, 146 (8th Cir.1964), the purchasers could have sought rescission of the land sale contracts and reclamation of all payments made under those contracts on the ground that a trustee can have no interest in property acquired by the fraud of the bankrupt.

. These fully executed contracts, by definition, include only those contracts, if any, under which Cochise had so completely performed its obligations thereunder by June 5, 1972 that any failure by Cochise (or by the trustee) to complete performance would not constitute a material breach of the contract by Cochise excusing further performance by the purchaser. Despite their obligation to continue payments on the notes, these purchasers might have claims against the estate for minor breaches by Cochise of the land sale contracts.

. Unlike cash and bank accounts, promissory notes that were in Cochise’s possession as of June 5, 1972 (if part of executory contracts) did not pass to the trustee as property of the estate. The broad language of subsections a(5) and a(6) of § 70 of the Bankruptcy Act, 11 U.S.C. § 110, would seemingly indicate that the trustee is vested on the date of filing with all contract rights of the bankrupt (including the right to payment on such promissory notes). However, those provisions must be read in conjunction with § 70b, 11 U.S.C. § 110(b), and the case law that has developed thereunder that hold that title to executory contracts and rights to future performance thereunder passes to the trustee only upon the affirmative act of adoption of the executory contract. See infra Part 11(B)(2). Since the trustee never affirmed any of the executory contracts, title to the promissory notes (i.e., the right to collect payments in the future) never passed to the trustee. See, e.g., In re Gravure Paper & Board Corp., 234 F.2d 928, 930-31 & n. 4 (3d Cir. 1956).
Even assuming that Perry did take “title” to such notes on June 5, 1972, and that such “notes” were in fact negotiable instruments, however, any “title” he took was taken by operation of law under the Act and not for value. Thus, he is merely a holder and not a holder in due course. Ariz.Rev.Stat. §§ 44-2532(C)(2), -44-2208(20) (1967) (U.C.C. §§ 3-302(3)(b), 1-201(20)). As a holder, Perry took the notes subject to all defenses of the lot purchasers, including such defenses as breach of the underlying land sale contracts, fraud in the making of the contracts, and failure of consideration. Ariz.Rev.Stat. § 44-2536(2) (1967) (U.C.C. § 3-306(b)). Unlike his right under a promissory note that is part of an executed contract, his right to enforce a note that is part of an executory contract was not unlimited but rather was subject to the defenses of the maiker (the lot purchaser). Cf. Smith v. Latourrette-Fical Co., 37 Ariz. 265, 269-70, 293 P. 973, 976 (1930) (holder takes promissory note furnished to seller of land subject to defenses of promissor-buyer, including counterclaim for recoupment for breach of seller’s covenant to supply land with water). Even if the trustee did take “title” to the notes on June 5, 1972, the breach of the underlying land sale contracts on the same date, see infra discussion in Part 11(B)(2), excused the purchasers from further performance (i.e., making payments) on the notes.

. The executory contracts upon which pre-filing payments were made were breached by operation of law as of June 5, 1972, because Perry never affirmatively adopted those con *1352 tracts. Bankruptcy Act §§ 70b, 63c, 11 U.S.C. §§ 110(b), 103(c) (1976); In re Gravure Paper & Board Corp., 234 F.2d 928, 930-31 (3d Cir. 1956); see infra discussion in Part 11(B)(2). The non-bankrupt party to an executory contract that has been breached, as a general creditor of the estate, has a provable claim against the estate for damages arising from the breach. Id. The appropriate damages are those ordinarily available for breach of contract and would account for any consideration paid to the bankrupt (including pre-filing payments).
Appellants apparently did not request the bankruptcy court to grant equitable liens on the purchased lots to secure the refund of prefiling payments from the estate for those purchasers who had not received a warranty deed by the date of filing. Thus, we do not consider whether an equitable lien could be extended to such a purchaser in the bankruptcy situation, giving him priority over unsecured creditors. Compare Countryman, Executory Contracts in Bankruptcy, 57 Minn.L.Rev. 439, 471-72 & n. 124 (1973) (questioning validity of lien) with Lacy, Land Sale Contracts in Bankruptcy, 21 U.C.L.A.L.Rev. 477, 485-91 (1973) (advocating lien); Levy, Bankruptcy and the Land Sale Contract, 23 Case W.Res.L.Rev. 393, 403-05, 409 (1972) (same); and 11 U.S.C. § 365(j) (Supp. V 1981) (Bankruptcy Reform Act of 1978) (providing for lien).

. See Central Trust Co. v. Chicago Auditorium Ass’n, 240 U.S. 581, 592, 36 S.Ct. 412, 415, 60 L.Ed. 811 (1916); In re Beverlyridge Co., 35 F.2d 818, 820 (9th Cir.1929); Workman v. Harrison, 282 F.2d 693, 699 (10th Cir. 1960) (applying § 63c to rejection of executory contract in reorganization proceeding); In re Marshall’s Garage, Inc., 63 F.2d 759, 761-62 (2d Cir.1933).

. E.g., Central Trust Co. v. Chicago Auditorium Ass’n, 240 U.S. 581, 587, 592-93, 36 S.Ct. 412, 413, 415, 60 L.Ed. 811 (1916) (rejection of livery service concession agreement gives rise to claim for damages in amount of damages arising from breach); In re Beverlyridge Co., 35 F.2d 818, 820-21 (9th Cir. 1929) (rejection of land conveyance contract gives rise to claim for damages in amount of value of land promised to be conveyed); Workman v. Harrison, 282 F.2d 693, 696, 699 (10th Cir.1960) (reorganization proceeding) (rejection of executory investment contract gives rise to claim for damages in amount of value of the contract at date petition was filed); In re Marshall’s Garage, Inc., 63 F.2d 759, 762-63 (2d Cir. 1933) (rejection of land sale contract gives rise to claim for damages in amount of value of contract calculated as if performed as contracted); In re New York Investors Mut. Group, Inc., 143 F.Supp. 51, 54 (S.D.N.Y.1956) (liquidation proceeding) (rejection of executory contract for sale of land gives rise to claim against estate for damages arising from breach).

. Since the trustee here was appointed before the adjudication of bankruptcy on June 7, 1973, the period during which the trustee could affirm the executory contracts of Cochise terminated 60 days after the adjudication on June 7, 1973 (August 6, 1973).

. The land sale contracts did not impose any obligation on the purchasers to continue payments on the notes to Cochise (the payee), or, conversely, any right of Cochise to collect such payments, after material breach of the underlying contracts. Consequently, even assuming that Perry took “title” to the promissory notes that were part of the executory land sale contracts, which we doubt, Perry’s mere taking of “title” to a particular note without affirmance of the underlying contract gave him no right to collect payments on the note. See supra note 10.

. Section 64a(l) of the Bankruptcy Act provides in part:
(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payments, shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition....
11 U.S.C. § 104(a)(1) (1976). Although by its terms this section applies only to straight bankruptcies, the Act provides elsewhere that § 64 also governs Chapter X reorganizations. 11 U.S.C. § 502 (1976).

. A claim for goods or services conferred on an estate pursuant to a contract entered by the trustee after the date of filing is valued according to the terms of that contract. See Bankruptcy Act § 64a(l), 11 U.S.C. § 104(a)(1) (1976). A claim for the trustee’s post-filing use of a leasehold pursuant to a lease entered by the bankrupt prior to filing is valued not according to the terms of the lease but objectively under a “reasonable worth” standard. In re First Research Corp., 457 F.2d 331, 332 (5th Cir. 1972); S. & W. Holding Co. v. Kuriansky, 317 F.2d 666, 668 (2d Cir.1963) (allowance for use and occupancy by trustee of leasehold is an expense of administration of estate and does not arise out of lease or have any relation to it). The reasonable worth of use and occupancy by the trustee is, however, ordinarily presumed to be equal to the contractual rental. Kuriansky, 317 F.2d at 667; In re Millard’s, Inc., 41 F.2d 498, 499 (7th Cir. 1930).

. See 4A J. Moore & L. King, Collier on Bankruptcy H 70.43[a], at 524 (14th ed. 1978); 6 Collier, j] 3.23 at 579; cf. Bank of Am. Nat’l Trust & Sav. Ass’n v. Smith, 336 F.2d 528, 529-30 (9th Cir. 1964) (rejection of executory contract presumed where “paramount charge” imposed on estate by liabilities under contract was not shown to outweigh “benefits”); In re Minges, 602 F.2d 38, 43-44 (2d Cir. 1979) (rejection of executory contract proper where no potential for “greater profit for the debtor’s estate” by affirming contract); In re Jackson Brewing Co., 567 F.2d 618, 621, 624 (5th Cir. 1978) (“rejection of .. . onerous [executory] contract is manifestly for the benefit of creditors, will enhance the possibility of reorganization, and even in the event of a liquidation, will permit an equitable distribution of the debtor’s assets among its creditors”); In re American Nat’l Trust, 426 F.2d 1059, 1064 (7th Cir. 1970) (rejection of executory contract proper where contract is “detrimental or onerous”).

. See supra note 16.

. If the trustee chooses to affirm an executory contract within the prescribed time limit, the trustee may sue the other party for damages if the other party has meanwhile failed to perform. 4A J. Moore & L. King, Collier on Bankruptcy H 70.43, at 536 (14th ed. 1978).

. We recognize that a party to an executory contract who is injured or fears injury by a delay on the affirmance/rejection decision may request a court order directing the trustee to affirm or reject the executory contract immediately. See generally Mohonk Realty Corp. v. Wise Shoe Stores, Inc., 111 F.2d 287, 290 (2d Cir.), cert. denied, 311 U.S. 654, 61 S.Ct. 47, 85 L.Ed. 418 (1940); 6 J. Moore & L. King, Collier on Bankruptcy 1) 3.23[6], at 583-86 (14th ed. 1978). However, we do not believe that the mere possibility of petitioning the court for such relief precludes special priority for claims based on payments that are made by a party who does not request relief.
Likewise, the requirement that a trustee may not assume an executory contract unless at the time of assumption the trustee cures the default, together with the fact that Cochise had apparently defaulted on the land sale contracts long before June 5, 1972, does not require that the purchasers be treated as unsecured general *1356 creditors as to post-filing payments. As unlikely as the trustee’s assumption of the executory land sale contract may have been, each purchaser was entitled to believe that the trustee might cure the default and assume the contract, to continue making payments on the contract, and to expect to have a claim against the estate for those payments of administrative expense priority, regardless of whether the trustee did or did not eventually affirm the contract.

. All administrative expense creditors must be treated with “absolute equality,” unless, of course, some creditors, with full knowledge of the facts, have agreed to subordinate their claims. Thomas Corp. v. Nicholas, 221 F.2d 286, 289 (5th Cir.1955). In this case, previous disbursements to other administrative expense creditors of the Cochise estate could possibly prevent the appellants from recovering that pro rata share of the assets of the estate that they would have received if all disbursements had been delayed until the trustee’s final accounting. The trustee, not having given notice to the land purchasers, is therefore personally liable for the difference. Thomas, 221 F.2d at 289-90 (where assets are “insufficient even to pay [administrative] costs,” trustee is personally liable to lessor for portion of lessor’s administrative expense claim which lessor would have received if trustee had postponed other administrative expense disbursements until final accounting); In re B.A. Montgomery & Son, 17 F.2d 404 (N.D.Ohio 1927) (where assets remaining in estate are insufficient to pay priority wage claim, trustee is personally liable, where trustee exhausted estate by paying general creditors). Under principles of restitution, the trustee may well have rights to recover money paid to other creditors that has unjustly enriched them; regardless of those rights, however, he is liable to the land sale purchasers for the share they otherwise would have received. Thomas, 221 F.2d at 290.

. See supra note 10.

. To the extent that Perry used these funds in the administration of the estate to satisfy claims which would otherwise be administrative expense claims, he is subrogated to those claims and is entitled to share pro rata in such dividends. He, and not the estate, however, is *1357 personally liable to the appellants for payments received by him or by Computer Graphics on his behalf after August 6, 1973. The appellants’ own claim for these payments is not a claim allowable against the estate.

. The trustee apparently obtained several ex parte orders from the bankruptcy court ordering Computer Graphics to turn over funds it held to the trustee and permitting the trustee to use various funds in the administration of the estate. Even if these orders were meant to cover payments after August 6, 1973, since no notice of these transactions was given to the individual land purchasers, despite their obvious status as “interested parties,” these orders are insufficient to relieve the trustee of personal liability. See Mosser v. Darrow, 341 U.S. 267, 274, 71 S.Ct. 680, 683, 95 L.Ed. 927 (1951).

. We reject the approach of the Tenth and Sixth Circuits which, in an apparent misreading of the seminal case of Mosser v. Darrow, 341 U.S. 267, 71 S.Ct. 680, 95 L.Ed. 927 (1951), have concluded that a bankruptcy or reorganization trustee may be held personally liable for damages only for injuries arising from intentional — as opposed to negligent — conduct. Sherr v. Winkler, 552 F.2d 1367, 1375 (10th Cir.1977); see Ford Motor Credit Co. v. Weaver, 680 F.2d 451, 461-62 (6th Cir.1982) (applying Sherr holding to debtor in possession case); see also United States v. Sapp, 641 F.2d 182, 184-85 (4th Cir. 1981) (dictum). Explaining the liability of a reorganization trustee for the im *1358 proper use of assets of the estate by his employees, the Mosser court stated:
The liability here is not created by a failure to detect defalcations, in which case negligence might be required to surcharge the trustee, but is a case of a willful and deliberate setting up of an interest in employees adverse to that of the trust.
341 U.S. at 272, 71 S.Ct. at 682. Interpreting this language, the Sherr court declared that “the court held that a reorganization trustee would not be liable personally except for willful and deliberate acts.” 552 F.2d at 1375; see Weaver, 680 F.2d at 461-62 (citing Sherr and Sapp).
Given that the term “surcharge” itself means to impose “personal liability on a fiduciary for wilful or negligent misconduct in the administration of his fiduciary duties,” Black’s Law Dictionary 1292 (rev. 5th ed. 1979) (emphasis added), we find this interpretation to be incorrect. Properly construed, the language quoted from Mosser indicates merely that the sort of personal liability which may be imposed on a trustee for the acts of his employees is not strict liability but rather liability depending at least on a showing of the trustee’s own negligence; Mosser does not “hold” in any sense that personal liability does not obtain if such a showing of negligence is made.

. While the debtor is in reorganization, court approval of the trustee’s decision to reject an executory contract is necessary, but the initial decision to request rejection remains in the trustee’s discretion. See Bankruptcy Act § 116(1), 11 U.S.C. § 516(1) (1976); 6 J. Moore & L. King, Collier on Bankruptcy j[ 3.23[6], at 580-81 (14th ed. 1978).

. The injury would be particularly pronounced and especially invidious where the assets of the estate are not sufficient to cover all administrative expense claims. In such circumstances, every dollar of payment made by the creditor (lot purchaser), while giving rise to a priority claim in that amount, will ultimately be only partially returned, yet will increase the pro-rata share available to other administrative expense creditors, including the trustee himself. See Mosser, 341 U.S. at 271, 71 S.Ct. at 682 (stressing importance of maintaining disinterestedness of trustee’s administration of the estate).

. The purchaser need not prove any such misconduct on the part of the trustee to recover post-rejection payments on executory contracts. See supra Part 11(B)(3).

. Misrepresentations that are actionable under Arizona law include both statements of existing ascertainable fact as well as promises to perform acts in the future where the promissor has no intention at the time the promise is made to perform the act. Fridenmaker, 23 Ariz.App. at 569, 534 P.2d at 1068.

. Even if a person does not know that a misrepresentation is false and, in fact, believes the misrepresentation to be true, if the speaker subsequently learns that the statement is false, he is liable in fraud for failure to correct the misrepresentation. Mammas v. Oro Valley Townhouses, Inc., 131 Ariz. 121, 123, 638 P.2d 1367, 1369 (Ariz.App. 1981).

. Even if the trustee had requested and the court had authorized such negligent or fraudulent misrepresentations, the trustee would nonetheless remain personally liable, since the record nowhere indicates that the purchasers were given notice of such a request, even though giving notice to “creditors and interested parties” is required before the trustee’s personal liability is waived. See Mosser, 341 U.S. at 874, 71 S.Ct. at 683.

. The papers before the bankruptcy court indicate that a genuine issue of fact remained on both the fraud and negligent misrepresentation claims. The affidavits and interrogatories fail to negate conclusively any of these factual issues: whether Perry or his agents made false representations (including both statements of fact and promises to perform certain acts); whether these statements or promises were material to the purchasers’ decision to make further payments; whether Perry ever knew or reasonably should have known that the statements were false; whether Perry ever knew that he had no intention or reasonably should have known that he had no ability to perform the promises; whether Perry acted to correct misrepresentations he believed to be true when made but later discovered to be false; whether he intended or reasonably should have realized that the purchasers would continue to make payments based on his statements and promises; whether the purchasers ignorantly and justifiably relied on the statements and promises; and whether the purchasers were injured.

. Apparently conceding that the summary judgment cannot be sustained on the grounds set forth below, Perry argues that, since the appellants here had entered contracts with Cochise, the trustee cannot be held liable for payments which purchasers were obliged to make under those contracts, even if the payments were induced by misrepresentations. See Berry v. Robotka, 9 Ariz.App. 461, 468, 453 P.2d 972, 979 (1969). We disagree, since the Berry defense is properly applicable only where the person relying on the alleged misrepresentations was in fact obligated under the terms of the contract or by law to continue performance. Arizona Title, 14 Ariz.App. at 494, 484 P.2d at 647. The answers to interrogatories and affidavits show that the continuation of payments on the land sale contracts was not the only course of action open to some, if not all, of the members of the Baldrian class on June 5, 1972.
As to those land sale contracts which were executory on June 5, 1972, by operation of law and as conceded by the trustee himself, each land sale contract was rejected by the trustee and thereby breached by the bankrupt as of that date. See supra discussion in Section 11(B). Hence, from June 5, 1972 onward, these Baldrian class members were not obligated by law to continue making payments, and against them the Berry defense is unavailable to Perry. Indeed, by failing to affirm those contracts, Perry in effect abandoned the Berry defense which would have otherwise shielded him from liability for his post-filing misrepresentations, assuming, that is, that such parties to executory contracts were in fact otherwise obligated to continue performance, which we doubt. The bankruptcy court was not justified in granting summary judgment for defendant based on that defense.
As to those lot purchasers, if any, whose land sale contracts had been wholly executed by Cochise on June 5, 1972, the bankruptcy court should have applied a similar analysis. The Berry defense is simply not available to a misrepresenting party where the party who is misled had valid defenses to further performance available at law or by contract, even where the misrepresenting party has performed all of his contractual obligations. See Arizona Title, 14 Ariz.App. at 494, 484 P.2d at 647. If a party to an executed contract was not obligated by law to continue making payments on his contract at the time Perry made the alleged misrepresentation, e.g., because he had an available claim for rescission or because fraud inhered in the making of the contract, that misrepresentation is actionable if that purchaser relied on the intentional or negligent false statement or promise in making payments to Perry.